Anne L. Weismann
D.C. Bar No. 298190
Melanie Sloan
D.C. Bar No. 434584
Kimberly D. Perkins
D.C. Bar No. 481460
Citizens for Responsibility
  and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C.  20005
202-408-5565

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>1400 Eye Street, N.W., Suite 450,<br>Washington, D.C.  20005<br><br>      Plaintiff,<br><br>      v.<br><br>U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530<br><br>      Defendant. | Civil Action No. |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, challenging the failure of the Department of Justice ("DOJ") to respond to the expedited request of plaintiff for documents relating to the varying public explanations DOJ has offered regarding the termination of nine U.S. Attorneys and how those explanations were shaped and influenced by Mark McKinnon and his public relations firms.

2. This case seeks declaratory relief that DOJ is in violation of the FOIA, 5 U.S.C. § 552(a)(6)(E)(i), for failing to respond to plaintiff's expedited request for records and injunctive relief ordering defendant DOJ to process immediately the requested records in their entirety.

## JURISDICTION AND VENUE

3. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the DOJ pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(A)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

4. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. CREW seeks to empower citizens to have an influential voice in government decisions and in the governmental decision-making process through the dissemination of information about public officials and their actions. To advance its mission, CREW uses a combination of research, litigation and advocacy. As part of its research, CREW uses government records made available to it under the FOIA.

5. CREW has invested considerable organizational resources in pushing the U.S. government to take ethics issues seriously. CREW monitors closely the laws and rules applicable to government agencies.

6. CREW is harmed by the DOJ's failure to process CREW's FOIA request on an expedited basis, because that failure harms CREW's ability to satisfy the compelling public need

2

for full, accurate and current information about the underlying differing justifications that high-level DOJ officials, including the Attorney General, have offered regarding the termination of nine U.S. Attorneys. 5 U.S.C. § 552(a)(6)(c). Absent this critical information, CREW cannot advance its mission of educating the public to ensure that the public continues to have a vital voice in government.

7. Defendant DOJ is an agency within the meaning of 5 U.S.C. § 552(f) and 5 U.S.C. § 702. The DOJ is the federal agency with possession and control of the requested records and is responsible for fulfilling plaintiff's FOIA request.

## STATUTORY FRAMEWORK

### The Freedom of Information Act

8. The FOIA, 5 U.S.C. § 552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

9. An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request and of the requester's right to appeal the agency's determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

10. In "unusual circumstances," an agency may delay its response to a FOIA request or appeal, but must provide notice and "the date on which a determination is expected to be dispatched." 5 U.S.C. § 552(a)(6)(B).

11. The FOIA also requires agencies to promulgate regulations that provide for expedited processing of FOIA requests where the requester has demonstrated a "compelling need" as well as "other cases determined by the agency." 5 U.S.C. § 552(a)(6)(E)(i). The FOIA

3

defines "compelling need" as including requests "made by a person primarily engaged in disseminating information" where there is an "urgency to inform the public concerning actual or alleged Federal Government activity." Id. at § 552(a)(6)(E)(v)(III).

12. Agencies are required to make a determination on a request for expedition within 10 calendar days "after the date of the request," 5 U.S.C. § 552(a)(6)(E)(ii)(I), and to give "expeditious consideration" to administrative appeals of such determinations. Id. at § 552(a)(6)(E)(ii)(II).

13. Agency decisions to deny or affirm denial of a request for expedition are subject to judicial review "based on the record before the agency at the time of the determination." 5 U.S.C. § 552(a)(6)(E)(iii).

14. A requester is not required to exhaust administrative remedies prior to seeking judicial review of an agency's denial of a request for expedited processing. See, e.g., Al-Fayed v. CIA, No. 00-2092, 2000 U.S. District LEXIS 21476, at *8 (D.D.C. Sept. 20, 2000).

15. The DOJ regulations provide for expedited processing of FOIA requests. 28 C.F.R. § 16.5. These regulations currently require the agency to process all requests for records within 10 working days after receipt of the request whenever it is determined that there is, among other things, "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information; or "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." Id.

16. This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

17. The FOIA provides a mechanism for disciplinary action against agency officials who have acted inappropriately in withholding records. Specifically, when requiring the release of improperly withheld records, if the Court makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously," a disciplinary investigation is triggered. 5 U.S.C. § 552(a)(4)(F).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

18. In and around April 2007, newspapers and other media began publishing numerous stories about the Department of Justice's firing of nine U.S. Attorneys, and its justification for the same. See e.g., Sean Cockerham, McKay Suggests Cover-Up in Prosecutor Case, The Olympian, May 20, 2007 (attached as Exhibit A); Dan Eggan and Paul Kane, House GOP Stands Behind Gonzalez, The Washington Post, May 11, 2007 (attached as Exhibit B); Dan Eggan, Justice Dept. Won't Release All Documents Lawmakers Seek, The Washington Post, April 27, 2007 (attached as Exhibit C).

19. On April 27, 2007, The Washington Post's Dan Eggan reported about DOJ's refusal to release 171 documents related to the firings of the U.S. Attorneys that included emails plotting DOJ's media strategies and press coverage. Dan Eggen, Justice Dept. Won't Release All Documents Lawmakers Seek, The Washington Post, April 27, 2007 (attached as Exhibit C).

20. On May 11, 2007, another article appeared in The Washington Post that discussed the shifting reasons being given by the attorney general for and the extent of White House political advisor Karl Rove's involvement in the U.S. attorney firings. Dan Eggan and Paul Kane, House GOP Stands Behind Gonzalez, The Washington Post, May 11, 2007 (attached as Exhibit B).

21. On May 22, 2007, *Truthout* reported that the White House had hired a well-known Republican operative to handle damage control following the U.S. attorney scandal. Matt Renner, <u>White House Coordinated with GOP Consultant on US Attorney Scandal</u>, *Truthout*, May 22, 2007 (attached as Exhibit D). The story discussed emails released by the DOJ to Mark McKinnon, a strategist whose firm works with clients to "turn risky public situations to their advantage," requesting talking points to respond to a critical column from another media outlet. <u>Id.</u>

22. On May 23, 2007, plaintiff sent by facsimile and first-class mail a FOIA request for records, regardless of format, and including electronic records and information, audiotapes, videotapes and photographs to the DOJ Office of Information and Privacy. <u>Letter from Anne L. Weismann to Melanie Ann Pustay, Director, Policy and Litigation, Office of Information and Privacy</u>, May 23, 2007 (attached as Exhibit E). Specifically, CREW's FOIA sought the following:

> (1) all emails sent to or from Mark McKinnon and any former or current Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys;

> (2) all emails sent to or from any individual or individuals at Maverick Media, Inc. and any former or current Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys; and

> (3) all emails sent to or from any individual or individuals at Public Strategies, Inc. and any former or current Department of Justice ("DOJ") employee in the Offices of Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys.

<u>Id.</u>

23. On May 23, 2007, plaintiff sent a separate letter by facsimile and first-class mail to the DOJ Office of Public Affairs seeking expedition of its FOIA request to the Office of Information and Privacy. Letter from Anne L. Weismann to Tasio Scolinos, Director, Office of Public Affairs, May 23, 2007 (attached as Exhibit F).

24. CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures and the request is primarily and fundamentally for non-commercial purposes. See Exhibits E & F. Specifically, the requested records are likely to contribute to the public's understanding of the extent to which the Department of Justice, with the assistance of the White House, has sought assistance from outside public relations companies to handle messaging and damage control from the U.S. attorneys firing controversy. Id.

25. In addition, CREW sought expedition for the express purpose of disseminating any responsive documents to the public based on the widespread and exceptional media interest in varying public explanations DOJ has offered regarding the termination of the U.S. Attorneys. Id.; See also Letter from Anne L. Weismann to Tasio Scolinos, Director, Office of Public Affairs, May 23, 2007.

26. CREW also sought expedition because of the urgency in informing the public about these matters. Letter from Anne L. Weismann to Tasio Scolinos, Director, Office of Public Affairs, May 23, 2007. CREW's website contains numerous examples of its efforts in informing the public in this regard, including a report it issued concerning missing White House email and the implications under the Presidential Records Act. See Without a Trace: The Story Behind the

7

Missing White House E-Mails and the Violations of the Presidential Records Act, April 12, 2007, http://www.citizensforethics.org/node/27607.

27.  On June 4, 2007, the Office of Information and Privacy acknowledged receipt of plaintiff's May 23, 2007 FOIA request and denied CREW's request for expedited processing. DOJ based its denial on its determination that plaintiff's primary activity "does not appear to be information dissemination, which is required for a requester to qualify for expedited processing." See Letter from Carmen L. Mallon, Chief of Staff, Office of Information and Privacy to Anne L. Weismann, Chief Counsel, CREW, June 4, 2007 (attached as Exhibit G).

28.  The Office of Information and Privacy further informed plaintiff that its request for expedited processing based on "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," had been directed to the Director of Public Affairs for a decision whether to grant or deny expedited processing under that standard. See id.

29.  On June 7, 2007, plaintiff sent a letter appealing DOJ's denial of its request for expedition of its FOIA request of May 23, 2007. Letter from Anne L. Weismann to Melanie Ann Pustay, June 7, 2007 (attached as Exhibit H). In the letter, plaintiff reiterated that it is an organization engaged "primarily in the dissemination of information," and fully satisfies the criteria for expedition. Id. CREW further described how it publishes reports based on information it receives through FOIA requests, including its recently published report that details the record-keeping practices of the White House. Id.

30.  On June 15, 2007, the Office of Information and Privacy responded to plaintiff's appeal of its Initial Request Staff's (IR Staff) decision to deny plaintiff's request for expedited treatment of plaintiff's FOIA request and affirmed the IR Staff's denial. Letter from Associate

Director Janice Galli McLeod to Anne L. Weismann, June 15, 2007 (attached as Exhibit I).  This
letter did not address plaintiff's other request for expedited treatment that was made directly to
DOJ's Office of Public Affairs.  Id.

31.  On June 27, 2007, the Director of Public Affairs denied plaintiff's request for
expedited processing of its May 23, 2007 FOIA request to the DOJ Office of Public Affairs
because the Director determined that "the subject of your [plaintiff's] request is not a matter of
widespread and exceptional media interest."  See Letter from Carmen L. Mallon, Chief of Staff
to Anne Weismann, June 27, 2007 (attached as Exhibit J).

32.  On July 10, 2007, plaintiff appealed the Office of Public Affairs' denial of its request
for expedited processing.  Letter from Kimberly D. Perkins to Melanie Ann Pustay, July 10,
2007 (attached as Exhibit K).  In the letter, plaintiff pointed out that in its initial request plaintiff
had included four articles that detail the DOJ's public explanations of the firings.  Id.  In its
appeal, plaintiff included an additional six articles regarding the DOJ's public explanations of
the US Attorney firings.  Id.  For example, plaintiff cited one article in its letter that describes the
emails released by DOJ discussing its use of Mark McKinnon and his media strategy company to
help with talking points related to the firings.  Id.

33.  On August 2, 2007, the Director of Public Affairs affirmed the denial of plaintiff's
request for expedition and July 10, 2007 appeal.

34.  On August 6, 2007, the Office of Information and Privacy sent plaintiff an interim
response to its May 23, 2007 FOIA request.  The letter informed plaintiff that no records
responsive to plaintiff's request had been located in the Offices of the Attorney General and
Associate Attorney General.  The office further stated that it is continuing to search in the Office

of the Deputy Attorney General. <u>Letter from Carmen L. Mallon to Anne Weismann</u>, August 6, 2007 (attached as Exhibit L).

35. To date, plaintiff has received no other response to its request for expedition.

36. Plaintiff has exhausted the applicable administrative remedies.

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE

**(Failure to Grant Expedited Processing of Records Under the FOIA)**

37. Plaintiff realleges and incorporates by reference all preceding paragraphs.

38. Plaintiff demonstrated that it met the requirements for expediting its FOIA request because plaintiff's primary activity is information dissemination and its request concerns a matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affects public confidence.

39. Therefore, defendant violated FOIA by refusing to expedite the processing of plaintiff's FOIA request.

40. Plaintiff is entitled to injunctive relief with respect to the expedited release and disclosure of the requested documents.

### CLAIM TWO

**(Failure to Produce Records)**

41. Plaintiff realleges and incorporates by reference all preceding paragraphs.

42. Plaintiff properly asked for records within DOJ's control.

43. Plaintiff is entitled by law to access to the records requested under the FOIA, unless defendant makes an explicit and justified statutory exemption claim.

44. Therefore defendant violated FOIA's mandate to release agency records to the public by failing to release the records as Plaintiff specifically requested.  5 U.S.C. §§552(a)(3)(A), 552(a)(4)(B).

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

(1)  Order the DOJ to process immediately the requested records in their entirety;

(2)  Order defendant DOJ upon completion of such expedited processing to disclose the requested records in their entirety and make copies available to plaintiff;

(3)  Provide for expedited proceedings in this action;

(4)  Award plaintiff reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

(5)  Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Kimberly D. Perkins
(D.C. Bar No. 481460)
Citizens for Responsibility and Ethics
 in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (20) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: September 13, 2007

11

# EXHIBIT A

Published May 20, 2007

## McKay suggests cover-up in prosecutor case

Sean Cockerham

WENATCHEE — Fired U.S. Attorney John McKay said Sunday he believes the Justice Department is covering up the real reason for his ouster.

"I can see why they would want to come up with an explanation other than the governor's election for why I would be on such a list," said McKay, the U.S. attorney for Western Washington until his firing in December.

McKay pointed to the revelation that he first appeared on the Bush administration firing list in 2005 during the heat of the furor over Washington state's election for governor. Some Republicans were appalled that McKay didn't bring charges of election fraud in the race won by Democrat Chris Gregoire.

"I still don't know if the 2004 governor's election was the principal reason I was asked to step down," McKay said in a speech at the Mainstream Republicans of Washington's Cascade Conference in Wenatchee.

"If it was, I think it is an entirely improper and perhaps illegal reason for my termination," said McKay.

McKay said he led a federal investigation that found no evidence of a crime in the election. He made clear he still has huge concerns over the controversial election that resulted in a Gregoire victory on the second recount by just 133 votes out of almost 3 million cast.

"There is no doubt in my mind there were a lot of stinky, nasty things about that election," McKay said in an interview.

But prosecuting a federal crime requires proof of more than just mistakes and incompetence in the handling of ballots, he said.

**One of nine**

McKay, a Republican appointed by President Bush, oversaw Justice department offices in Tacoma and Seattle for five years. That's before he was one of nine U.S. attorneys nationwide to lose their jobs in what has become a huge controversy for Attorney General Alberto Gonzales.

McKay's Sunday speech at the Mainstream Republicans of Washington conference was his first appearance before a political group since he was fired. He sounded like a candidate at times, talking about the values of being a Republican and saying he wants to be involved somehow in politics.

But he denied speculation he's planning a run for office.

He said he hopes Dino Rossi, the Republican who lost to Gregoire, will run again in 2008.

McKay said he would support Rossi.

The Justice Department has offered a shifting set of explanations for McKay's firing. Gonzales first said it was because of comments McKay made to the Seattle Post-Intelligencer about budget cuts and because of how McKay pursued an information-sharing project. But both of those happened after he was put on the firing list in March 2005.

Kyle Sampson, Gonzales' chief of staff, has raised the possibility that McKay made the list for pushing too hard for additional resources to investigate the Seattle murder of Assistant U.S. Attorney Thomas Wales.

Sampson kept the list of prosecutors to be fired.

McKay said Sunday that would be a "despicable" reason if that's actually why he was fired.

"I frankly don't believe it," he told the state mainstream Republican group. "I think they are trying to cover something up."

Gonzales has acknowledged he was aware of a "great deal of concern" from Washington state Republicans over how McKay handled fraud allegations in the 2004 governor's race. The attorney general told Congress earlier this month that he doesn't know if that's a reason McKay made the list.

"I never expected to have to look over my shoulder politically to see if many people back there wanted more voter fraud cases and I was missing the opportunity," McKay said.

There are at least seven states where it appears that U.S. attorneys were fired or considered for firing as Republicans in those states urged investigations or prosecutions of possible Democratic voter fraud, McClatchy Newspapers has reported.

# EXHIBIT B

136 of 220 DOCUMENTS

# The Washington Post

## washingtonpost.com

The Washington Post

May 11, 2007 Friday

Met 2 Edition

# House GOP Stands Behind Gonzales; New Details of White House Pressure to Fire U.S. Attorneys Do Not Sway Republicans

**BYLINE:** Dan Eggen and Paul Kane; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A04

**LENGTH:** 1200 words

House Republicans rallied around embattled Attorney General Alberto R. Gonzales yesterday during intense questioning by Democrats, even as revelations emerged about attempts to fire U.S. attorneys singled out for criticism by White House political adviser Karl Rove.

Appearing more confident as he has kept his job and the support of President Bush, Gonzales rebuffed questions by Democrats on the House Judiciary Committee about the firings of eight U.S. attorneys and repeated his defense of the dismissals as warranted, if poorly handled.

Gonzales asserted that the January 2006 removal of a U.S. attorney in Kansas City, Mo., revealed in media reports yesterday was not part of the same process that led to the firings of the other prosecutors. He also said he had "no basis to believe" that the dismissal of Todd P. Graves was connected to GOP unhappiness over his handling of voter-fraud cases.

"It's always been my understanding that this focus has always been on the eight United States attorneys," Gonzales testified, adding later: "As part of this review process . . . these were the individuals that were identified."

New details emerged yesterday about the extent of Rove's involvement in pressing complaints about the U.S. attorney in Milwaukee, Steven Biskupic, and in urging the Justice Department to launch an investigation there before last November's elections.

Gonzales's senior aides came closer than previously known to firing Biskupic, who had been identified by Rove as weak on prosecuting voter fraud, according to interviews conducted by congressional staff and disclosed yesterday.

But D. Kyle Sampson, Gonzales's former chief of staff, told investigators that Deputy Attorney General Paul J. McNulty argued against the firing, saying it would "not be a wise thing to do politically" and could raise "the ire" of Rep. F. James

Sensenbrenner Jr. (R-Wis.), who had recommended Biskupic and was then chairman of the House Judiciary Committee.

A separate interview with Justice aide Matthew Friedrich showed that Rove's office sent a packet of voter-fraud allegations about Milwaukee compiled by Republican activists to Gonzales's office last October, three weeks before the elections, with a request to investigate.

The packet from Rove came to Friedrich around the same time the senior Bush adviser also complained to Gonzales about the lack of voter-fraud cases against liberal get-out-the-vote groups in Milwaukee, Philadelphia and New Mexico.

Friedrich, Gonzales's senior counselor, told congressional investigators last week that the packet immediately set off alarm bells because forwarding it to criminal investigators would violate strict Justice rules that limit the pursuit of voter-related investigations close to an election. Friedrich said he did nothing with the material.

Both Biskupic and Sensenbrenner said yesterday that they never talked to each other about individual cases or about voter-fraud matters, and Biskupic said he did not know that his job was in jeopardy.

Biskupic also played down the voter-fraud complaints, saying that he and a local Democratic prosecutor jointly investigated such allegations in 2005 and found only scattered evidence of wrongdoing. "We tried to address them in a serious and detailed way, but in a way that did not impact any election," he said. "I think we did that."

White House spokesman Tony Fratto said in a statement that "it's no secret that we and others had long-standing concerns about voter fraud in a number of places," including Milwaukee. Fratto said Democrats' "breathless reaction to any mention of Karl Rove is more than a little bit weird."

Friedrich also provided further details about the extent of GOP efforts to remove then-U.S. Attorney David C. Iglesias of New Mexico, the target of complaints from Rove, Sen. Pete V. Domenici (R-N.M.) and New Mexico Republican Party officials.

Friedrich told investigators that he met twice last year with New Mexico Republicans who had complaints about Iglesias and his handling of a criminal investigation of Democrats. They made similar complaints to Rove, Domenici and Monica M. Goodling, a Gonzales aide who has since resigned, Friedrich said. Iglesias was later fired.

From the opening moments of yesterday's hearing, House Judiciary Republicans sought to counter almost every Democratic accusation against Gonzales, providing a stark contrast with Senate Republicans, who gave the attorney general a chilly reception three weeks ago. At that hearing on April 19, one of the Senate Judiciary Committee's most conservative members, Sen. Tom Coburn (R-Okla.), called on the attorney general to resign. That demand was heard only from Democrats yesterday.

GOP members repeatedly accused Democrats of searching, but failing to find, scandal in the appointment and removal of U.S. attorneys. "We're acting around this place like U.S. attorneys are the product of the Immaculate Conception, and once they've been created that cannot be undone," said Rep. Dan Lungren (R-Calif.).

Republicans also forced Rep. Linda T. Sanchez (D-Calif.) to apologize for calling one Republican a "target" of a federal inquiry. Media reports about Rep. Jerry Lewis (R-Calif.) have said that he is under scrutiny over his ties to a

lobbying firm. In Justice Department nomenclature, the target of a probe is in imminent danger of being indicted.

Some Republicans highlighted investigations of Democrats to paint a broader picture of corruption. Sensenbrenner demanded that Gonzales indict Rep. William J. Jefferson (D-La.) in a bribery investigation that has involved legal wrangling over evidence. Rep. Steve King (R-Iowa) protested the fact that Rep. Alan B. Mollohan (D-W.Va.), who is also under FBI investigation, is in charge of the Appropriations Committee's panel on Justice Department funding.

Democrats sought to keep the focus on the U.S. attorney firings, expressing exasperation at Gonzales's frequent referrals to Sampson, who coordinated the dismissals with the White House. "You'll have to talk to Mr. Sampson about the list," Gonzales said at one point.

Rep. Jerrold Nadler (D-N.Y.) joined other Democrats in challenging Gonzales's ability to lead the Justice Department under a cloud of scandal. "If most people believe that the United States attorney general has not told the truth about why these U.S. attorneys were fired, how can they have confidence in your job?" Nadler asked.

"I don't believe that's an accurate statement," Gonzales said. "And what I'm trying to do in appearances like this is to set the record straight."

Graves said in an interview Wednesday that he was asked to leave his post as U.S. attorney in January 2006 -- the same month that his name appeared on a firing list compiled by Sampson. The removal makes Graves the ninth U.S. attorney known to have been dismissed last year and conflicts with testimony from Gonzales and others that the effort was limited to eight prosecutors.

Graves said he was told simply that he should resign to "give another person a chance." He said he did not oppose the department's request, because he had been planning to return to private practice.

Staff writer Amy Goldstein and staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** May 11, 2007

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**GRAPHIC:** IMAGE; By Nikki Kahn -- The Washington Post; Attorney General Alberto Gonzales said the dismissal of a U.S. attorney in Missouri was not related to other firings.

**PUBLICATION-TYPE:** Newspaper

Copyright 2007 The Washington Post
All Rights Reserved

# EXHIBIT C

Justice Dept. Won't Release All Documents Lawmakers Seek - washingtonpost.com    Page 1 of 1

Case 1:07-cv-01620-RMC    Document 1-2    Filed 09/13/2007    Page 8 of 78

washingtonpost.com

# Justice Dept. Won't Release All Documents Lawmakers Seek

Advertisement



By Dan Eggen
Friday, April 27, 2007; A21

After releasing nearly 6,000 pages of documents related to the firings of eight U.S. attorneys, the Justice Department says it is drawing the line.

In a letter sent last night to the Senate and House Judiciary committees, Justice gave a list of 171 documents it is withholding from Congress because they involve "congressional and media inquiries" about the dismissals, seven of which occurred Dec. 7.

According to descriptions on the list, Justice will hold e-mails plotting media strategies, draft letters to Capitol Hill, various memoranda and "discussions" related to conversations between Attorney General Alberto R. Gonzales and lawmakers.

One e-mail from D. Kyle Sampson, Gonzales's then-chief of staff, focuses on a hotly disputed meeting in December between Gonzales and Sen. Mark Pryor (D-Ark.). Pryor has said he felt lied to by Gonzales because the attorney general had assured him that Justice had no plans to circumvent Senate confirmation for a new U.S. attorney in Little Rock. Subsequent documents show that such a plan was discussed by Gonzales's aides before and after the Pryor meeting. Gonzales has said he opposed the idea.

The records also indicate that senior Justice officials, including Deputy Attorney General Paul J. McNulty, spent a great deal of time critiquing press coverage. The department chose to release a handful of e-mails focused on two stories in the New York Times and The Washington Post in early March.

© 2007 The Washington Post Company

Ads by Google

Rudy in Reagan DOJ
National Review Article on Rudy's Term in Reagan Justice Dept
www.joinrudy20008.com/reaganjd

Alberto Gonzales
The President won't fire Attoney General Gonzales but YOU CAN
www.chbn.com

Become a US Citizen
Apply for US Citizenship online. Learn if you qualify for free.
www.USCitizenship.info

# EXHIBIT D



# t r u t h o u t • issues

truthout



donate

🖶 Print This Story    📧 E-mail This Story

XML

## White House Coordinated With GOP Consultant on US Attorney Scandal
By Matt Renner
t r u t h o u t | Report

Tuesday 22 May 2007



subscribe

Emails released late Monday by the US Justice Department show the White House hired a well-known Republican operative to handle damage control in the aftermath of the US attorney scandal.



issues

Mark McKinnon, a heavyweight strategist whose primary company, Maverick Media Inc., did almost $170 million in business with the Bush-Cheney 2004 presidential campaign, appears to have been hired by Peter Wehner, director of the White House Office of Strategic Initiatives, which "plans, develops, and coordinates a long-range strategy for achieving presidential priorities," and "conducts research and assists in message development," according to the White House web site. Wehner worked with McKinnon in an official capacity, corresponding through McKinnon's company email account. It is unknown whether McKinnon was paid for his work.



environment

McKinnon also serves as the vice chairman of Public Strategies Inc., a corporate public relations firm that is staffed primarily by political campaign strategists.

In what may prove to be telling advice, McKinnon's PR firm works with clients to "turn risky public situations to their advantage," and advises them to "pay as much attention to issues in the public arena as they do to running their day-to-day business," according to their mission statement. According to the firm's web site, political strategists make excellent public relations consultants because they "have the tenacity to stay the course, not just through Election Day, but well beyond."

m

multimedia

The emails clearly show that a request for talking points to respond to a critical column written by Joe Conason of Salon.com, was made by McKinnon as a consultant to the White House Office of Strategic Initiatives: " ... Do we have something off the shelf on this...?" referring to Conason's article.

c

contact

White House officials requested information for McKinnon from Kyle Sampson, former chief of staff for Attorney General Alberto Gonzales, and Monica Goodling, former DOJ liaison to the White House. Sampson and Goodling coordinated the official response to the media questions about the firings.

?

about us

Associate Counsel to the President Christopher Oprison received an email from Goodling with responsive documents for McKinnon. "The relevant talkers and statistics are contained in the attached documents," Goodling wrote. Seemingly concerned about the idea of giving privileged, nonpublic information to a private public relations firm, Oprison responded by asking, "Is any of this material public and can it be disseminated to Mark McKinnon?" Goodling responded to his concern by writing, "It is info we have given to friendlies on the Hill. It can all go."

In response to this new information, Naomi Seligman Steiner, spokesperson for Citizens for Responsibility and Ethics in Washington, said: "This administration has a

history of hiring outside consultants at taxpayer expense to provide government officials with public relations advice."

In 2005, during the Bush administration's attempt to privatize Social Security, it was revealed that the administration paid public relations giant Fleishman-Hillard nearly $1.8 million to help trump-up the risks faced by the Social Security system.

The Bush administration also came under fire for hiring the public relations firm Ketchum to coordinate messaging for the No Child Left Behind Act (NCLB). As part of a contract agreement between the Department of Education and Ketchum, the popular African-American pundit Armstrong Williams "would regularly comment on NCLB during the course of his broadcasts and would work with African-American newspapers to place stories and commentary on NCLB." Williams was paid $240,000 for his advocacy of the program.

At the time, the senior Democrat on the education committee, Rep. George Miller (D-California), told USA Today that the contract was "a very questionable use of taxpayers' money" that was "probably illegal."

This revelation comes at a sensitive time for the administration. Congressmen from both parties have called for the resignation of Attorney General Alberto Gonzales because of the shifting and sometimes contradictory explanations for the firings given by Gonzales and other DOJ officials.

Monica Goodling is scheduled to testify with immunity before the House of Representatives Judiciary Committee on Wednesday. Prior to her limited guarantee of immunity, Goodling invoked her Fifth Amendment right and refused to testify for fear of self-incrimination. Her testimony could shed light on questions that have yet to be answered in the attorney firing investigation, because she was a central figure in the firings and the subsequent public relations struggle.

Over the weekend, the ranking Republican on the Senate Judiciary Committee, Arlen Specter (R-Pennsylvania), told CBS that he thought Gonzales might resign prior to a "no-confidence" vote in the Senate. The vote will probably not occur before the Memorial Day recess.

Appearing with Specter, Sen. Dianne Feinstein (D-California) said, "I'm very worried about the department. I think its credibility is crumbling.... And I think the only thing that can really change that is a new attorney general." Specter predicted that a "sizable number" of Republicans would join Democrats in a vote of "no-confidence," a historical rarity in the US.

*Matt Renner is a reporter for Truthout.*

-------

### Jump to today's Truthout Features:

| Today's Truthout Features |
|---|

Print This Story    E-mail This Story

©: t r u t h o u t 2007

| t r u t h o u t | issues | environment | labor | women | health | voter rights | multimedia | donate | contact |
subscribe | about us | rss feed | archive |

# EXHIBIT E

# CREW | citizens for responsibility and ethics in washington

May 23, 2007

**By fax (202-514-1009) and first-class mail**

Melanie Ann Pustay
Director, Policy and Litigation
Office of Information and Privacy
U.S. Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C. 20530-0001

**Re: Freedom of Information Act Request**

Dear Ms. Pustay:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, audiotapes, videotapes and photographs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552, et seq.

Specifically, CREW seeks the following records:

(1) all emails sent to or from Mark McKinnon and any former or current Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys;

(2) all emails sent to or from any individual or individuals at Maverick Media, Inc. and any former or current Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys;

(3) all emails sent to or from any individual or individuals at Public Strategies, Inc. and any former or current Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys.

Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

### Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 28 C.F.R. § 16.11(k), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and expenditures, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent to which the Department of Justice, including with the assistance of the White House, has sought assistance from outside public relations companies to handle messaging and damage control from the controversy involving the Department's firing of U.S. Attorneys and the resulting controversy.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and

2

advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, CREW's website contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's website demonstrates, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

## Request for Expedition

Pursuant to 5 U.S.C. § 552(a)(6)(E)(1) and 28 C.F.R. § 16.5(d)(iv), CREW requests that the Department of Justice expedite the processing of this request. As required by Department of Justice regulations, 28 C.F.R. § 16.5(d)(2), CREW is submitting its request for expedition to the Director of Public Affairs. A copy of CREW's request is enclosed.

CREW also requests that DOJ expedite its request pursuant to 28 C.F.R. § 16.5(d)(ii). As explained above, CREW is engaged primarily in the dissemination of information that it gathers from a variety of sources, including the FOIA, and seeks the information requested in this FOIA for the express purpose of disseminating it to the public. CREW's website contains numerous examples of its efforts, including reports it has published based on information it receives. CREW recently publishes a report, Without a Trace: The Story Behind the Missing White House E-Mails and the Violations of the Presidential Records Act, that details the record-keeping practices of the White House and how they violate federal records laws.

Moreover, there is a particular urgency in informing the public about the degree to which the varying public explanations DOJ has offered regarding the termination of nine U.S. Attorneys were shaped by the input and influence of Mark McKinnon and his companies. The actions of the DOJ in this regard have resulted in serious questions being raised about the integrity of DOJ. The public has a need to know the full facts underlying the differing justifications that high-level DOJ officials, including the Attorney General, have offered for their actions. Under these circumstances, CREW satisfies the requirements for expedition.

Pursuant to 28 C.F.R. § 16.5(d)(3), I hereby certify that the basis for CREW's request for expedition, as outlined above, is true and correct to the best of my knowledge and belief.

3

**Conclusion**

If you have any questions about this request or foresee any problems in releasing fully the requested records on an expedited basis, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Anne L. Weismann, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

ANNE L. WEISMANN
Chief Counsel

Enclosure

cc: Tasio Scolinos

4



**CREW** | citizens for responsibility and ethics in washington

1400 Eye Street N.W., Suite 450
Washington, D.C. 20005
Phone: 202-408-5565
Fax: 202-588-5020

---

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: | FROM: |
| Melanie Ann Pustay | Anne L. Weismann |
| COMPANY: | DATE: |
| Office of Information and Privacy | 5/23/07 |
| RECIPIENT'S FAX NUMBER: | |
| 202-514-1009 | PAGE 1 OF 7_ |
| RECIPIENT'S PHONE NUMBER: | RE: |
| | FOIA request |

NOTES/COMMENTS:

*Pages transmitted are privileged and confidential.*

TRANSMISSION VERIFICATION REPORT

```
                                    TIME : 05/23/2007 16:25
                                    NAME : CREW
                                    FAX  : 2025885020
                                    TEL  : 2024085565
                                    SER.# : 000B6J828633
```

```
DATE,TIME              05/23  16:24
FAX NO./NAME           2025141009
DURATION               00:00:58
PAGE(S)                07
RESULT                 OK
MODE                   STANDARD
                       ECM
```

# EXHIBIT F

# CREW | citizens for responsibility and ethics in washington

May 23, 2007

**By fax (202-514-5331) and first-class mail**

Tasio Scolinos
Director
Office of Public Affairs
U.S. Department of Justice
Room 1128
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Re:  FOIA Request for Expedition

Dear Ms. Scolinos:

Pursuant to U.S. Department of Justice ("DOJ") Freedom of Information Act ("FOIA")
regulations, specifically 28 C.F.R. § 16.5(d)(2), Citizens for Responsibility and Ethics in
Washington ("CREW") requests that its request for expedition of the enclosed FOIA request of
this date be granted.[1]

CREW's request seeks emails sent to or from the Offices of the Attorney General, Deputy
Attorney General, Associate Attorney General and Mark McKinnon, Maverick Media, Inc. and
Public Strategies, Inc. concerning any aspect of the congressional inquiry into the firing of U.S.
Attorneys.

CREW requests expedition in light of the widespread and exceptional media interest in
this matter and the questions that have been raised about not only DOJ's reasons for the firings,
but also the differing public explanations DOJ has offered for its actions.  As a result, there are
substantial concerns about the integrity of DOJ that affect public confidence in both the Attorney
General and the agency that he heads.  See, e.g., Sean Cockerham, McKay Suggests Cover-Up in
Prosecutor Case, *The Olympian*, May 20, 2007; Dan Eggen and Paul Kane, House GOP Stands
Behind Gonzales, *The Washington Post*, May 11, 2007; Dan Eggen, Justice Dept. Won't Release
All Documents Lawmakers Seek, *The Washington Post*, April 27, 2007.[2]  Newly released DOJ
emails also show that the White House hired Mark McKinnon of Maverick Media Inc., who is

---

[1] CREW's FOIA is enclosed as Attachment 1.

[2] These articles are enclosed as Attachment 2.

also vice-chairman of Public Strategies Inc., "to handle damage control in the aftermath of the US attorney scandal." Matt Renner, <u>White House Coordinated With GOP Consultant on US Attorney Scandal</u>, *Truthout*, May 22, 2007 (enclosed as Attachment 3).

In light of this widespread and exceptional media interest and the possible questions about the government's integrity affecting public confidence, CREW satisfies the DOJ requirements for expedition. <u>See</u> 28 C.F.R. § 16.5(d)(1)(iv). Moreover, as CREW explained in its FOIA request, CREW is a non-profit corporation engaged primarily in disseminating information it gathers from a variety of sources, including the FOIA, and seeks the information requested in this FOIA request for the express purpose of disseminating it to the public. CREW's website, <u>www.citizensforethics.org,</u> contains links to thousands of pages of documents CREW acquired from multiple FOIA requests, as well as documents related to CREW's FOIA litigation, Internal Revenue complaints and Federal Election complaints.

For the foregoing reasons, as well as those set forth in CREW's FOIA request of May 23, 2007, CREW requests that its FOIA request be expedited.

Pursuant to 28 C.F.R. § 16.5(d)(3), I hereby certify that the basis for CREW's request for expedition is true and correct to the best of my knowledge and belief.

Sincerely,

ANNE L. WEISMANN
Chief Counsel

Enclosures

cc:  Melanie Ann Pustay

# CREW | citizens for responsibility and ethics in washington

May 23, 2007

**By fax (202-514-5331) and first-class mail**

Tasio Scolinos
Director
Office of Public Affairs
U.S. Department of Justice
Room 1128
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Re: FOIA Request for Expedition

Dear Ms. Scolinos:

Pursuant to U.S. Department of Justice ("DOJ") Freedom of Information Act ("FOIA") regulations, specifically 28 C.F.R. § 16.5(d)(2), Citizens for Responsibility and Ethics in Washington ("CREW") requests that its request for expedition of the enclosed FOIA request of this date be granted.[1]

CREW's request seeks emails sent to or from the Offices of the Attorney General, Deputy Attorney General, Associate Attorney General and Mark McKinnon, Maverick Media, Inc. and Public Strategies, Inc. concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys.

CREW requests expedition in light of the widespread and exceptional media interest in this matter and the questions that have been raised about not only DOJ's reasons for the firings, but also the differing public explanations DOJ has offered for its actions. As a result, there are substantial concerns about the integrity of DOJ that affect public confidence in both the Attorney General and the agency that he heads. See, e.g., Sean Cockerham, McKay Suggests Cover-Up in Prosecutor Case, *The Olympian*, May 20, 2007; Dan Eggen and Paul Kane, House GOP Stands Behind Gonzales, *The Washington Post*, May 11, 2007; Dan Eggen, Justice Dept. Won't Release All Documents Lawmakers Seek, *The Washington Post*, April 27, 2007.[2] Newly released DOJ emails also show that the White House hired Mark McKinnon of Maverick Media Inc., who is

---

[1] CREW's FOIA is enclosed as Attachment 1.

[2] These articles are enclosed as Attachment 2.

also vice-chairman of Public Strategies Inc., "to handle damage control in the aftermath of the US attorney scandal." Matt Renner, <u>White House Coordinated With GOP Consultant on US Attorney Scandal</u>, *Truthout*, May 22, 2007 (enclosed as Attachment 3).

In light of this widespread and exceptional media interest and the possible questions about the government's integrity affecting public confidence, CREW satisfies the DOJ requirements for expedition. <u>See</u> 28 C.F.R. § 16.5(d)(1)(iv). Moreover, as CREW explained in its FOIA request, CREW is a non-profit corporation engaged primarily in disseminating information it gathers from a variety of sources, including the FOIA, and seeks the information requested in this FOIA request for the express purpose of disseminating it to the public. CREW's website, www.citizensforethics.org, contains links to thousands of pages of documents CREW acquired from multiple FOIA requests, as well as documents related to CREW's FOIA litigation, Internal Revenue complaints and Federal Election complaints.

For the foregoing reasons, as well as those set forth in CREW's FOIA request of May 23, 2007, CREW requests that its FOIA request be expedited.

Pursuant to 28 C.F.R. § 16.5(d)(3), I hereby certify that the basis for CREW's request for expedition is true and correct to the best of my knowledge and belief.

Sincerely,

ANNE L. WEISMANN
Chief Counsel

Enclosures

cc: Melanie Ann Pustay

2

# ATTACHMENT 1

# CREW | citizens for responsibility and ethics in washington

May 23, 2007

**By fax (202-514-1009) and first-class mail**

Melanie Ann Pustay
Director, Policy and Litigation
Office of Information and Privacy
U.S. Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C. 20530-0001

**Re: Freedom of Information Act Request**

Dear Ms. Pustay:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, audiotapes, videotapes and photographs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552, et seq.

Specifically, CREW seeks the following records:

(1) all emails sent to or from Mark McKinnon and any former or current Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys;

(2) all emails sent to or from any individual or individuals at Maverick Media, Inc. and any former or current Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys;

(3) all emails sent to or from any individual or individuals at Public Strategies, Inc. and any former or current Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning any aspect of the congressional inquiry into the firing of U.S. Attorneys.

Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), <u>cert. denied</u>, 415 U.S. 977 (1972). As you are aware, a <u>Vaughn</u> index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." <u>Founding Church of Scientology v. Bell</u>, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the <u>Vaughn</u> index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" <u>Id</u>. at 224 (citing Mead <u>Data Central v. U.S. Dep't of the Air Force</u>, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. <u>See</u> 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. <u>Mead Data Central</u>, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a <u>Vaughn</u> index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## <u>Fee Waiver Request</u>

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 28 C.F.R. § 16.11(k), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and expenditures, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). <u>See</u>, <u>e.g.</u>, <u>McClellan Ecological v. Carlucci</u>, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the extent to which the Department of Justice, including with the assistance of the White House, has sought assistance from outside public relations companies to handle messaging and damage control from the controversy involving the Department's firing of U.S. Attorneys and the resulting controversy.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and

advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, CREW's website contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's website demonstrates, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

### Request for Expedition

Pursuant to 5 U.S.C. § 552(a)(6)(E)(1) and 28 C.F.R. § 16.5(d)(iv), CREW requests that the Department of Justice expedite the processing of this request. As required by Department of Justice regulations, 28 C.F.R. § 16.5(d)(2), CREW is submitting its request for expedition to the Director of Public Affairs. A copy of CREW's request is enclosed.

CREW also requests that DOJ expedite its request pursuant to 28 C.F.R. § 16.5(d)(ii). As explained above, CREW is engaged primarily in the dissemination of information that it gathers from a variety of sources, including the FOIA, and seeks the information requested in this FOIA for the express purpose of disseminating it to the public. CREW's website contains numerous examples of its efforts, including reports it has published based on information it receives. CREW recently publishes a report, Without a Trace: The Story Behind the Missing White House E-Mails and the Violations of the Presidential Records Act, that details the record-keeping practices of the White House and how they violate federal records laws.

Moreover, there is a particular urgency in informing the public about the degree to which the varying public explanations DOJ has offered regarding the termination of nine U.S. Attorneys were shaped by the input and influence of Mark McKinnon and his companies. The actions of the DOJ in this regard have resulted in serious questions being raised about the integrity of DOJ. The public has a need to know the full facts underlying the differing justifications that high-level DOJ officials, including the Attorney General, have offered for their actions. Under these circumstances, CREW satisfies the requirements for expedition.

Pursuant to 28 C.F.R. § 16.5(d)(3), I hereby certify that the basis for CREW's request for expedition, as outlined above, is true and correct to the best of my knowledge and belief.

3

## Conclusion

If you have any questions about this request or foresee any problems in releasing fully the requested records on an expedited basis, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Anne L. Weismann, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

ANNE L. WEISMANN
Chief Counsel

Enclosure

cc: Tasio Scolinos

4

# ATTACHMENT 2

Published May 20, 2007

## McKay suggests cover-up in prosecutor case

Sean Cockerham

WENATCHEE — Fired U.S. Attorney John McKay said Sunday he believes the Justice Department is covering up the real reason for his ouster.

"I can see why they would want to come up with an explanation other than the governor's election for why I would be on such a list," said McKay, the U.S. attorney for Western Washington until his firing in December.

McKay pointed to the revelation that he first appeared on the Bush administration firing list in 2005 during the heat of the furor over Washington state's election for governor. Some Republicans were appalled that McKay didn't bring charges of election fraud in the race won by Democrat Chris Gregoire.

"I still don't know if the 2004 governor's election was the principal reason I was asked to step down," McKay said in a speech at the Mainstream Republicans of Washington's Cascade Conference in Wenatchee.

"If it was, I think it is an entirely improper and perhaps illegal reason for my termination," said McKay.

McKay said he led a federal investigation that found no evidence of a crime in the election. He made clear he still has huge concerns over the controversial election that resulted in a Gregoire victory on the second recount by just 133 votes out of almost 3 million cast.

"There is no doubt in my mind there were a lot of stinky, nasty things about that election," McKay said in an interview.

But prosecuting a federal crime requires proof of more than just mistakes and incompetence in the handling of ballots, he said.

### One of nine

McKay, a Republican appointed by President Bush, oversaw Justice department offices in Tacoma and Seattle for five years. That's before he was one of nine U.S. attorneys nationwide to lose their jobs in what has become a huge controversy for Attorney General Alberto Gonzales.

McKay's Sunday speech at the Mainstream Republicans of Washington conference was his first appearance before a political group since he was fired. He sounded like a candidate at times, talking about the values of being a Republican and saying he wants to be involved somehow in politics.

But he denied speculation he's planning a run for office.

He said he hopes Dino Rossi, the Republican who lost to Gregoire, will run again in 2008.

McKay said he would support Rossi.

The Justice Department has offered a shifting set of explanations for McKay's firing. Gonzales first said it was because of comments McKay made to the Seattle Post-Intelligencer about budget cuts and because of how McKay pursued an information-sharing project. But both of those happened after he was put on the firing list in March 2005.

Kyle Sampson, Gonzales' chief of staff, has raised the possibility that McKay made the list for pushing too hard for additional resources to investigate the Seattle murder of Assistant U.S. Attorney Thomas Wales.

Sampson kept the list of prosecutors to be fired.

McKay said Sunday that would be a "despicable" reason if that's actually why he was fired.

"I frankly don't believe it," he told the state mainstream Republican group. "I think they are trying to cover something up."

Gonzales has acknowledged he was aware of a "great deal of concern" from Washington state Republicans over how McKay handled fraud allegations in the 2004 governor's race. The attorney general told Congress earlier this month that he doesn't know if that's a reason McKay made the list.

"I never expected to have to look over my shoulder politically to see if many people back there wanted more voter fraud cases and I was missing the opportunity," McKay said.

There are at least seven states where it appears that U.S. attorneys were fired or considered for firing as Republicans in those states urged investigations or prosecutions of possible Democratic voter fraud, McClatchy Newspapers has reported.

# House GOP Stands Behind Gonzales

New Details of White House Pressure to Fire U.S. Attorneys Do Not Sway
Republicans

By Dan Eggen and Paul Kane
Washington Post Staff Writers
Friday, May 11, 2007; A04

House Republicans rallied around embattled Attorney General Alberto R.
Gonzales yesterday during intense questioning by Democrats, even as
revelations emerged about attempts to fire U.S. attorneys singled out for
criticism by White House political adviser Karl Rove.

Appearing more confident as he has kept his job and the support of President
Bush, Gonzales rebuffed questions by Democrats on the House Judiciary
Committee about the firings of eight U.S. attorneys and repeated his defense
of the dismissals as warranted, if poorly handled.

Gonzales asserted that the January 2006 removal of a U.S. attorney in Kansas
City, Mo., revealed in media reports yesterday was not part of the same
process that led to the firings of the other prosecutors. He also said he had
"no basis to believe" that the dismissal of Todd P. Graves was connected to
GOP unhappiness over his handling of voter-fraud cases.

"It's always been my understanding that this focus has always been on the
eight United States attorneys," Gonzales testified, adding later: "As part of
this review process . . . these were the individuals that were identified."

New details emerged yesterday about the extent of Rove's involvement in
pressing complaints about the U.S. attorney in Milwaukee, Steven Biskupic,
and in urging the Justice Department to launch an investigation there before
last November's elections.

Gonzales's senior aides came closer than previously known to firing
Biskupic, who had been identified by Rove as weak on prosecuting voter fraud, according to interviews
conducted by congressional staff and disclosed yesterday.

But D. Kyle Sampson, Gonzales's former chief of staff, told investigators that Deputy Attorney General
Paul J. McNulty argued against the firing, saying it would "not be a wise thing to do politically" and
could raise "the ire" of Rep. F. James Sensenbrenner Jr. (R-Wis.), who had recommended Biskupic and
was then chairman of the House Judiciary Committee.

A separate interview with Justice aide Matthew Friedrich showed that Rove's office sent a packet of
voter-fraud allegations about Milwaukee compiled by Republican activists to Gonzales's office last
October, three weeks before the elections, with a request to investigate.

The packet from Rove came to Friedrich around the same time the senior Bush adviser also complained
to Gonzales about the lack of voter-fraud cases against liberal get-out-the-vote groups in Milwaukee,
Philadelphia and New Mexico.



Friedrich, Gonzales's senior counselor, told congressional investigators last week that the packet immediately set off alarm bells because forwarding it to criminal investigators would violate strict Justice rules that limit the pursuit of voter-related investigations close to an election. Friedrich said he did nothing with the material.

Both Biskupic and Sensenbrenner said yesterday that they never talked to each other about individual cases or about voter-fraud matters, and Biskupic said he did not know that his job was in jeopardy.

Biskupic also played down the voter-fraud complaints, saying that he and a local Democratic prosecutor jointly investigated such allegations in 2005 and found only scattered evidence of wrongdoing. "We tried to address them in a serious and detailed way, but in a way that did not impact any election," he said. "I think we did that."

White House spokesman Tony Fratto said in a statement that "it's no secret that we and others had long-standing concerns about voter fraud in a number of places," including Milwaukee. Fratto said Democrats' "breathless reaction to any mention of Karl Rove is more than a little bit weird."

Friedrich also provided further details about the extent of GOP efforts to remove then-U.S. Attorney David C. Iglesias of New Mexico, the target of complaints from Rove, Sen. Pete V. Domenici (R-N.M.) and New Mexico Republican Party officials.

Friedrich told investigators that he met twice last year with New Mexico Republicans who had complaints about Iglesias and his handling of a criminal investigation of Democrats. They made similar complaints to Rove, Domenici and Monica M. Goodling, a Gonzales aide who has since resigned, Friedrich said. Iglesias was later fired.

From the opening moments of yesterday's hearing, House Judiciary Republicans sought to counter almost every Democratic accusation against Gonzales, providing a stark contrast with Senate Republicans, who gave the attorney general a chilly reception three weeks ago. At that hearing on April 19, one of the Senate Judiciary Committee's most conservative members, Sen. Tom Coburn (R-Okla.), called on the attorney general to resign. That demand was heard only from Democrats yesterday.

GOP members repeatedly accused Democrats of searching, but failing to find, scandal in the appointment and removal of U.S. attorneys. "We're acting around this place like U.S. attorneys are the product of the Immaculate Conception, and once they've been created that cannot be undone," said Rep. Dan Lungren (R-Calif.).

Republicans also forced Rep. Linda T. Sanchez (D-Calif.) to apologize for calling one Republican a "target" of a federal inquiry. Media reports about Rep. Jerry Lewis (R-Calif.) have said that he is under scrutiny over his ties to a lobbying firm. In Justice Department nomenclature, the target of a probe is in imminent danger of being indicted.

Some Republicans highlighted investigations of Democrats to paint a broader picture of corruption. Sensenbrenner demanded that Gonzales indict Rep. William J. Jefferson (D-La.) in a bribery investigation that has involved legal wrangling over evidence. Rep. Steve King (R-Iowa) protested the fact that Rep. Alan B. Mollohan (D-W.Va.), who is also under FBI investigation, is in charge of the Appropriations Committee's panel on Justice Department funding.

Democrats sought to keep the focus on the U.S. attorney firings, expressing exasperation at Gonzales's frequent referrals to Sampson, who coordinated the dismissals with the White House. "You'll have to talk to Mr. Sampson about the list," Gonzales said at one point.

Rep. Jerrold Nadler (D-N.Y.) joined other Democrats in challenging Gonzales's ability to lead the Justice Department under a cloud of scandal. "If most people believe that the United States attorney general has not told the truth about why these U.S. attorneys were fired, how can they have confidence in your job?" Nadler asked.

"I don't believe that's an accurate statement," Gonzales said. "And what I'm trying to do in appearances like this is to set the record straight."

Graves said in an interview Wednesday that he was asked to leave his post as U.S. attorney in January 2006 -- the same month that his name appeared on a firing list compiled by Sampson. The removal makes Graves the ninth U.S. attorney known to have been dismissed last year and conflicts with testimony from Gonzales and others that the effort was limited to eight prosecutors.

Graves said he was told simply that he should resign to "give another person a chance." He said he did not oppose the department's request, because he had been planning to return to private practice.

# Justice Dept. Won't Release All Documents Lawmakers Seek

By Dan Eggen
Friday, April 27, 2007; A21

After releasing nearly 6,000 pages of documents related to the firings of eight U.S. attorneys, the Justice Department says it is drawing the line.

In a letter sent last night to the Senate and House Judiciary committees, Justice gave a list of 171 documents it is withholding from Congress because they involve "congressional and media inquiries" about the dismissals, seven of which occurred Dec. 7.

According to descriptions on the list, Justice will hold e-mails plotting media strategies, draft letters to Capitol Hill, various memoranda and "discussions" related to conversations between Attorney General Alberto R. Gonzales and lawmakers.

One e-mail from D. Kyle Sampson, Gonzales's then-chief of staff, focuses on a hotly disputed meeting in December between Gonzales and Sen. Mark Pryor (D-Ark.). Pryor has said he felt lied to by Gonzales because the attorney general had assured him that Justice had no plans to circumvent Senate confirmation for a new U.S. attorney in Little Rock. Subsequent documents show that such a plan was discussed by Gonzales's aides before and after the Pryor meeting. Gonzales has said he opposed the idea.

The records also indicate that senior Justice officials, including Deputy Attorney General Paul J. McNulty, spent a great deal of time critiquing press coverage. The department chose to release a handful of e-mails focused on two stories in the New York Times and The Washington Post in early March.



WACHOVIA

Free Checking
There's No Catch

get free checking
WITH WACHOVIA

WACHOVIA

**ATTACHMENT 3**

## White House Coordinated With GOP Consultant on US Attorney Scandal
By Matt Renner
t r u t h o u t | Report

Tuesday 22 May 2007

Emails released late Monday by the US Justice Department show the White House hired a well-known Republican operative to handle damage control in the aftermath of the US attorney scandal.

Mark McKinnon, a heavyweight strategist whose primary company, Maverick Media Inc., did almost $170 million in business with the Bush-Cheney 2004 presidential campaign, appears to have been hired by Peter Wehner, director of the White House Office of Strategic Initiatives, which "plans, develops, and coordinates a long-range strategy for achieving presidential priorities," and "conducts research and assists in message development," according to the White House web site. Wehner worked with McKinnon in an official capacity, corresponding through McKinnon's company email account. It is unknown whether McKinnon was paid for his work.

McKinnon also serves as the vice chairman of Public Strategies Inc., a corporate public relations firm that is staffed primarily by political campaign strategists.

In what may prove to be telling advice, McKinnon's PR firm works with clients to "turn risky public situations to their advantage," and advises them to "pay as much attention to issues in the public arena as they do to running their day-to-day business," according to their mission statement. According to the firm's web site, political strategists make excellent public relations consultants because they "have the tenacity to stay the course, not just through Election Day, but well beyond."

The emails clearly show that a request for talking points to respond to a critical column written by Joe Conason of Salon.com, was made by McKinnon as a consultant to the White House Office of Strategic Initiatives: "[...] Do we have something off the shelf on this...?" referring to Conason's article.

White House officials requested information for McKinnon from Kyle Sampson, former chief of staff for Attorney General Alberto Gonzales, and Monica Goodling, former DOJ liaison to the White House. Sampson and Goodling coordinated the official response to the media questions about the firings.

Associate Counsel to the President Christopher Oprison received an email from Goodling with responsive documents for McKinnon. "The relevant talkers and statistics are contained in the attached documents," Goodling wrote. Seemingly concerned about the idea of giving privileged, nonpublic information to a private public relations firm, Oprison responded by asking, "Is any of this material public and can it be disseminated to Mark McKinnon?" Goodling responded to his concern by writing, "It is info we have given to friendlies on the Hill. It can all go."

In response to this new information, Naomi Seligman Steiner, spokesperson for Citizens for Responsibility and Ethics in Washington, said: "This administration has a history of hiring outside consultants at taxpayer expense to provide government officials with public relations advice."

In 2005, during the Bush administration's attempt to privatize Social Security, it was revealed that the administration paid public relations giant Fleishman-Hillard nearly $1.8 million to help trump-up the risks faced by the Social Security system.

The Bush administration also came under fire for hiring the public relations firm Ketchum to coordinate messaging for the No Child Left Behind Act (NCLB). As part of a contract agreement between the Department of Education and Ketchum, the popular African-American pundit Armstrong Williams "would regularly comment on NCLB during the course of his broadcasts and would work with African-American newspapers to place stories and commentary on NCLB." Williams was paid $240,000 for his advocacy of the program.

At the time, the senior Democrat on the education committee, Rep. George Miller (D-California), told USA Today that the contract was "a very questionable use of taxpayers' money" that was "probably illegal."

This revelation comes at a sensitive time for the administration. Congressmen from both parties have called for the resignation of Attorney General Alberto Gonzales because of the shifting and sometimes contradictory explanations for the firings given by Gonzales and other DOJ officials.

Monica Goodling is scheduled to testify with immunity before the House of Representatives Judiciary Committee on Wednesday. Prior to her limited guarantee of immunity, Goodling invoked her Fifth Amendment right and refused to testify for fear of self-incrimination. Her testimony could shed light on questions that have yet to be answered in the attorney firing investigation, because she was a central figure in the firings and the subsequent public relations struggle.

Over the weekend, the ranking Republican on the Senate Judiciary Committee, Arlen Specter (R-Pennsylvania), told CBS that he thought Gonzales may resign prior to a "no-confidence" vote in the Senate. The vote will probably not occur before the Memorial Day recess.

Appearing with Specter, Sen. Dianne Feinstein (D-California) said, "I'm very worried about the department. I think its

credibility is crumbling.... And I think the only thing that can really change that is a new attorney general." Specter predicted that a "sizable number" of Republicans would join Democrats in a vote of "no-confidence," a historical rarity in the US.



# CREW | citizens for responsibility and ethics in washington

1400 Eye Street N.W., Suite 450
Washington, D.C. 20005
Phone: 202-408-5565
Fax: 202-588-5020

---

**FACSIMILE TRANSMITTAL SHEET**

---

| TO: | FROM: |
|---|---|
| Tasio Scolinos | Anne L. Weismann |

| COMPANY: | DATE: |
|---|---|
| Office of Public Affairs | 5/23/07 |

| RECIPIENT'S FAX NUMBER: | |
|---|---|
| 202-514-5331 | PAGE 1 OF 17 |

| RECIPIENT'S PHONE NUMBER: | RE: |
|---|---|
| | FOIA request for expedition |

NOTES/COMMENTS:

*Pages transmitted are privileged and confidential.*

TRANSMISSION VERIFICATION REPORT

```
                                    TIME : 05/23/2007 16:30
                                    NAME : CREW
                                    FAX  : 2025885020
                                    TEL  : 2024085565
                                    SER.# : 000B6J828633
```

```
        DATE,TIME              05/23  16:27
        FAX NO./NAME           2025145331
        DURATION              00:03:06
        PAGE(S)               17
        RESULT               OK
        MODE                 STANDARD
                             ECM
```

# EXHIBIT G

**U.S. Department of Justice**

Office of Information and Privacy

_____

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*


Ms. Anne L. Weismann                         **JUN 0 4 2007**
Chief Counsel
Citizens for Responsibility and Ethics
  in Washington                    Re:   AG/07-R0617
1400 Eye Street, NW                      DAG/07-R0618
Suite 450                                ASG/07-R0619
Washington, DC  20005                    CLM:MLF:GEB

Dear Ms. Weisman:

      This is to acknowledge receipt of your letter dated May 23, 2007, which was received in
this Office on May 25, 2007, in which you requested copies of emails between former and current
Department of Justice employees in the Offices of the Attorney, Deputy Attorney General, and
Associate Attorney General and Mark McKinnon or Maverick Media, Inc. or Public Strategies, Inc.
regarding the Congressional inquiry into the firings of United States Attorneys.  This response is
made on behalf of the Offices of the Attorney General, Deputy Attorney General, and Associate
Attorney General.

      You have requested expedited processing of your request under the Department's standard
permitting expedition for requests involving "[a]n urgency to inform the public about an actual or
alleged federal government activity, if made by a person primarily engaged in disseminating
information." 28 C.F.R. § 16.5(d)(1)(ii) (2006).  Based on the information you have provided, I
have determined that your request for expedited processing under this standard should be denied
because the primary activity of your organization does not appear to be information dissemination,
which is required for a requester to qualify for expedited processing under this standard.

      You have also requested expedited processing of your request pursuant to the Department's
standard permitting expedition for requests involving "[a] matter of widespread and exceptional
media interest in which there exist possible questions about the government's integrity which
affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv).  Pursuant to Department of Justice
regulations, we directed your request to the Director of Public Affairs, who makes the decision
whether to grant or deny expedited processing under this standard.  See id. at § 16.5(d)(2).  Please
be advised that as of the date of this letter, that determination is still pending with the Office of
Public Affairs.  Once we have received notification of the Director's decision, we will notify you
promptly.  Nevertheless, please be advised that your request has been assigned to a FOIA Specialist
in this Office and searches are being initiated in the Offices of the Attorney General, Deputy
Attorney General, and Associate Attorney General.

-2-

We have not yet made a decision on your request for a fee waiver. We will do so after we determine whether fees will be assessed for this request.

If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, you may contact Ginae Barnett, the analyst processing your request, by telephone at the above number or you may write to her at the above address.

If you are not satisfied with the denial of your request for expedited processing, you may administratively appeal by writing to the Director, Office of Information and Privacy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, within sixty days from the date of this letter. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

*Laurie A. Day*

for Carmen L. Mallon
Chief of Staff

# EXHIBIT H

# CREW | citizens for responsibility and ethics in washington

June 7, 2007

**By facsimile (202 514-1009) and first-class mail**

Melanie Ann Pustay
Director, Office of Information and Privacy
U.S. Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C. 20530-0001

Re:  Freedom of Information Act Appeal

Dear Ms. Pustay:

By letter dated June 4, 2007, and received by Citizens for Responsibility and Ethics in Washington ("CREW") on June 6, 2007, Carmen L. Mallon, Chief of Staff for your office, advised me that CREW's request for expedition of its Freedom of Information Act ("FOIA") request of May 23, 2007, was denied.  CREW hereby appeals that determination and requests that you reverse it for the reasons set forth below.

CREW's FOIA request of May 23, 2007,[1] sought copies of emails sent to or from Mark McKinnon, Maverick Media, Inc., and/or Public Strategies, Inc. and any current or former Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning the congressional inquiry into the firings of U.S. Attorneys.  In accordance with 5 U.S.C. § 552(a)(6)(E)(i) and 28 C.F.R. §§ 16.5(d)(1)(ii) and 16.5(d)(1)(iv), CREW requested that DOJ expedite its processing of CREW's FOIA request.  CREW's request for expedition pursuant to 28 C.F.R. § 16.5(d)(1)(iv) was made directly to DOJ's Office of Public Affairs, as DOJ regulations require.

In her letter of June 6, 2007, Ms. Mallon denied CREW's request for expedition made pursuant to 28 C.F.R. § 16.5(d)(1)(ii) "because the primary activity of your organization does not appear to be information dissemination, which is required for a requester to qualify for expedited processing under this standard."  She noted that CREW's additional request for expedition pursuant to 28 C.F.R. § 16.5(d)(1)(iv) was still pending with the Office of Public Affairs.

---

[1] Ms. Mallon claims in her letter that your office received our FOIA request on May 25, 2007.  Our fax cover sheet (attached) shows that our FOIA request, which was faxed to your office on May 23, 2007, was received by your office on May 23, 2007.

This determination is wrong as a matter of law and fact. As CREW explained in its request for expedition, CREW is a non-profit corporation engaged primarily in the dissemination of information that it gathers from a variety of sources, including the FOIA, and seeks the information requested in its FOIA request of May 23, 2007, for the express purpose of disseminating it to the public. CREW's website, www.citizensforethics.org, contains numerous examples of its efforts, including reports it has published based on information it receives. For example, CREW recently published a report, <u>Without a Trace:  The Story Behind the Missing White House E-Mails and the Violations of the Presidential Records Act</u>, that details the record-keeping practices of the White House and how they violate federal records laws. Moreover, CREW has established in interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. <u>See</u> http://foia.citizensforethics.org/home. CREW's websites currently contain links to thousands of pages of documents CREW acquired from multiple FOIA requests. As CREW's website demonstrates, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use. Dissemination of information to the public is at the core of CREW's central mission.

On the basis of this record there can be no legitimate question that because CREW is engaged primarily in the dissemination of information, CREW satisfies the criteria for expedition. As with the Electronic Privacy Information Center and the ACLU, two organizations that the courts have found satisfy this criteria,[2] CREW "'gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience.'" <u>ACLU</u>, 321 F.Supp.2d at 30 n.5, *quoting* <u>EPIC</u>, 241 F.Supp.2d at 11.

CREW's request for expedition also explained that there is a particular urgency in informing the public about the degree to which the varying public explanations DOJ has offered regarding the termination of nine U.S. Attorneys were shaped by the input and influence of outside media consultants such as Mark McKinnon and his companies. The actions of DOJ in this regard have resulted in serious questions being raised about the integrity of DOJ. The public has a need to know the full facts underlying the differing justifications that high-level DOJ officials, including the Attorney General, have offered for their actions. Ms. Mallon's letter of June 6, 2007, does not dispute this urgency.

---

[2] <u>See</u> <u>ACLU v. U.S. Dep't of Justice</u>, 321 F.Supp.2d 24, 30 (D.D.C. 2004); <u>EPIC v. Dep't of Defense</u>, 241 F.Supp.2d 5, 11 (D.D.C. 2003).

2

Under these circumstances, CREW satisfies fully the criteria for expedition of its FOIA request. Ms. Mallon's initial determination to the contrary rests solely on a single statement that is factually and legally erroneous. Accordingly, the initial determination of your office denying CREW's request must be reversed.

Sincerely,

ANNE L. WEISMANN
Chief Counsel

enclosure

3

```
┌─────────────────────────────────────────┐
│  TRANSMISSION VERIFICATION REPORT        │
└─────────────────────────────────────────┘
```

```
                              TIME   : 05/23/2007 16:25
                              NAME   : CREW
                              FAX    : 2025085020
                              TEL    : 2024085565
                              SER.#  : 000B6J828633
```

| | |
|---|---|
| DATE,TIME | 05/23  16:24 |
| FAX NO./NAME | 2025141009 |
| DURATION | 00:00:58 |
| PAGE(S) | 07 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |



# CREW | citizens for responsibility and ethics in washington

1400 Eye Street N.W., Suite 450
Washington, D.C. 20005
Phone: 202-408-5565
Fax: 202-588-5020

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: | FROM: |
| Melanie Pustay | Anne L. Weismann |
| COMPANY: | DATE: |
| Office of Information and Privacy | 6/7/07 |
| RECIPIENT'S FAX NUMBER: | |
| 202-514-1009 | PAGE 1 OF 5_ |
| RECIPIENT'S PHONE NUMBER: | RE: |
| | Freedom of Information Act Appeal |

NOTES/COMMENTS:

*Pages transmitted are privileged and confidential.*

TRANSMISSION VERIFICATION REPORT

TIME : 06/07/2007 11:29
NAME : CREW
FAX  : 2025885020
TEL  : 2024065565
SER.# : 000B6J828633

| | |
|---|---|
| DATE,TIME | 06/07  11:28 |
| FAX NO./NAME | 2025141009 |
| DURATION | 00:00:36 |
| PAGE(S) | 05 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

# EXHIBIT I

**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                      *Washington, D.C. 20530*

JUN 15 2007

---

Anne L. Weismann, Esq.
Citizens for Responsibility and Ethics
  in Washington                          Re:    Appeal No. 07-1631
Suite 450                                              Request Nos. AG/07-R0617,
1400 Eye Street, NW                                    DAG/07-R0618 and ASG/07-R0619
Washington, DC 20005                                   JTR:KM

Dear Ms. Weismann:

      You appealed from the action of the Initial Request Staff (IR Staff) of the Office of
Information and Privacy, acting on behalf of the Offices of the Attorney General, Deputy
Attorney General, and Associate Attorney General, on your request for access to copies of e-mail
messages between former and current Department of Justice employees and Mark McKinnon,
Maverick Media, Inc., or Public Strategies, Inc. regarding the Congressional inquiry into the
several resignations of United States Attorneys. Specifically, you appealed the decision of the IR
Staff to deny your request for expedited treatment of your request for records.

      In your request for expedited treatment to the IR Staff, you requested expedited treatment
pursuant to the second standard enumerated in the Department of Justice's regulations. Under the
second standard, you must show that there is "[a]n urgency to inform the public about an actual
or alleged federal government activity, if made by a person primarily engaged in disseminating
information." 28 C.F.R. § 16.5(d)(1)(ii) (2006). This letter addresses your appeal from the
denial of expedited treatment by the IR Staff and does not address your pending request for
expedited treatment that was made directly to the Department of Justice's Office of Public
Affairs.

      After carefully considering your appeal, I am affirming the IR Staff's action in denying
your request for expedited treatment. I have determined that you have not met your burden under
this standard because you have not met the threshold inquiry of being "primarily engaged in
disseminating information." Id. § 16.5(d)(1)(ii). Although Citizens for Responsibility and Ethics
in Washington (CREW) may well engage in the dissemination of information, you have not
demonstrated that it is "primarily engaged" in disseminating information. See ACLU of N. Cal.
v. U.S. Dep't of Justice, No. 04-4447, 2005 WL 588354, at *14 (N.D. Cal. Mar. 11, 2005)
("[T]he court agrees with defendants that while dissemination of information may be a main
activity of ACLU-NC, there is no showing that it is the main activity."). Indeed, CREW's own
Web site describes itself as:

a nonprofit . . . organization dedicated to promoting ethics and accountability in government and public life by targeting government officials -- regardless of party affiliation -- who sacrifice the common good to special interests. CREW advances its mission using a combination of research, litigation and media outreach. CREW employs the law as a tool to force officials to act ethically and lawfully and to bring unethical conduct to the public's attention through: Litigation[;] Freedom of Information Act Requests[;] Ethics Complaints[;] Internal Revenue Service Complaints[;] Federal Election Commission Complaints[; and] Requests for investigations[.]

"CREW: About CREW," http://www.citizensforethics.org/about.html (last visited June 13, 2007). CREW's Web site emphasizes its use of "high-impact legal actions to target government officials who sacrifice the common good to special interests." Id. Notably, the dissemination of information is not listed as the main activity. Indeed, according to the Web site, dissemination of information appears to play a minor role comparatively in CREW's daily business. Thus, you have not demonstrated that CREW is "primarily engaged" in disseminating information. Without such a showing, expedited processing pursuant to the second standard is not warranted. Accordingly, the IR Staff properly denied your request for expedited treatment under the second standard.

If you are dissatisfied with my action on your appeal for expedited treatment of your request, you may seek judicial review in accordance with 5 U.S.C. § 552(a)(6)(E)(iii).

Sincerely,

Janice Galli McLeod
Associate Director

# EXHIBIT J

**U.S. Department of Justice**

Office of Information and Privacy

_Telephone: (202) 514-3642_                    _Washington, D.C. 20530_

**JUN 27 2007**

Anne Weismann, Esq.
Chief Counsel
Citizens for Responsibility and Ethics
 in Washington                          Re:   AG/07-R0617
1400 Eye Street, NW                              DAG/07-R0618
Suite 450                                        ASG/07-R0619
Washington, DC  20005                            CLM:MLF:GEB

Dear Ms. Weismann:

    This is in regard to your Freedom of Information Act (FOIA) request dated May 23, 2007, which was received in this Office on May 25, 2007, in which you requested copies of emails between former and current Department of Justice employees in the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General and Mark McKinnon or Maverick Media, Inc., or Public Strategies, Inc. regarding the Congressional inquiry into the firings of United States Attorneys.  This response is made on behalf of the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General.

    You have requested expedited processing of your request pursuant to the Department's standard permitting expedition for requests involving "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  28 C.F.R. § 16.5(d)(1)(iv) (2006).  Pursuant to Department policy, the Director of Public Affairs makes the decision whether to grant or deny expedited processing under this category.  See id. at § 16.5(d)(2).  The Director has determined that the standard is not met because the subject of your request is not a matter of widespread and exceptional media interest.  Accordingly, your request for expedited processing has been denied.  Nevertheless, as we advised you in our letter dated June 4, 2007, your request has been assigned to a FOIA Specialist in this Office and is currently being processed.

    If you are not satisfied with Director of Public Affairs denial of your request for expedited processing, you may administratively appeal by writing to the Director, Office of Information and

-2-

Privacy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, within sixty days from the date of this letter.  Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Carmen L. Mallon
Chief of Staff

# EXHIBIT K

# CREW | citizens for responsibility and ethics in washington

July 10, 2007

Melanie Ann Pustay
Director, Office of Information and Privacy
U.S. Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C. 20530-0001

Re: Freedom of Information Act Appeal

Dear Ms. Pustay:

By letter dated June 27, 2007, and received by Citizens for Responsibility and Ethics in Washington ("CREW") on July 2, 2007, Carmen L. Mallon advised CREW that its request for expedition of its Freedom of Information Act ("FOIA") request of May 23, 2007, was denied.[1] CREW hereby appeals that determination and requests that you reverse it for the reasons set forth below.

CREW's FOIA request of May 23, 2007,[2] with the Office of Public Affairs, sought copies of emails sent to or from Mark McKinnon, Maverick Media, Inc., and/or Public Strategies, Inc. and any current or former Department of Justice ("DOJ") employee in the Offices of the Attorney General, Deputy Attorney General and/or Associate Attorney General concerning the congressional inquiry into the firings of U.S. Attorneys. In accordance with 5 U.S.C. § 552(a)(6)(E)(I) and 28 C.F.R. §§ 16.5(d)(1)(ii) and 16.5(d)(1)(iv), CREW requested that DOJ expedite its processing of CREW's FOIA request. CREW's request for expedition pursuant to 28 C.F.R. § 16.5(d)(1)(iv) was made directly to DOJ's Office of Public Affairs, as DOJ regulations require.

In her letter of June 27, 2007, Ms. Mallon denied CREW's request for expedition made pursuant to 28 C.F.R. § 16.5(d)(1)(iv) "because the subject of your request is not a matter of widespread and exceptional media interest."

This determination is wrong as a matter of law and fact. Not only is this a matter of

---

[1] On June 15, 2007, CREW received a letter from Janice McLeod, Associate Director for the Office of Information and Privacy, in which she confirmed her Office's decision to deny CREW's expedited processing appeal of June 7, 2007. CREW sent out two FOIAs on May 23, 2007 - - one to the Office of Information and Privacy, and the other one, at issue here, to the Office of Public Affairs, seeking essentially the same information.

[2] Ms. Mallon claims in her letter that your office received our FOIA request on May 25, 2007. Our fax cover sheet (attached) shows that our FOIA request, which was faxed to your office on May 23, 2007, was received by your office on May 23, 2007.

widespread and exceptional media interest in which there exists possible questions about the government's integrity, but as CREW explained in its request for expedition, there is a particular urgency in informing the public about the degree to which the varying public explanations DOJ has offered regarding the termination of nine U.S. Attorneys were shaped by the input and influence of outside media consultants such as Mark McKinnon and his companies. In our original FOIA request, CREW cited four articles that detail the DOJ's public explanations of the US Attorney firings and the hiring of McKinnon and his companies to handle damage control. We have included an additional six articles regarding the same with this appeal.

Each of these articles highlight the fact that there is widespread and exceptional media interest in this subject matter for which we seek documents. For example, in one article, details emerge that within the hundreds of emails released by the Justice Department concerning the firing of the US Attorneys, some of the emails showed that Monica Goodling approved White House aide Chris Oprison's suggestion that department talking points be given to Mark McKinnon, a media strategist who worked with presidential adviser Karl Rove during Bush's campaigns. Laurie Kellman, Congress Oks bill limiting White House power to appoint prosecutors; Bush expected to sign, *The Associated Press*, May 22, 2007.

Moreover, the actions of the DOJ have resulted in serious questions being raised about the integrity of DOJ. The public has a need to know the full facts underlying the differing justifications that high-level DOJ officials, including the Attorney General, have offered for their actions, and the use of McKinnon's media relations' companies to spin these justifications. Ms. Mallon's letter of June 27, 2007, does not dispute the media interest or urgency in this regard.

On the basis of this record there can be no legitimate question that this is a matter of widespread and exceptional media interest in which there are questions about the DOJ's integrity. Also, there is a particular urgency in informing the public of the requested information as the information is a breaking news story that will lose its value if there is a delay in obtaining these documents. 5 U.S. C. § 552(a)(6)(E)(v)(II); ACLU v. DOD, 2006 U.S. Dist. LEXIS 36888 (N.D. Cal. May 25, 2006).

Under these circumstances, CREW satisfies fully the criteria for expedition of its FOIA request. Ms. Mallon's initial determination to the contrary rests solely on a single statement that is factually and legally erroneous. Accordingly, the initial determination of your office denying CREW's request must be reversed.

Sincerely,

Kimberly D. Perkins
Counsel

enclosure

2

**CREW** | citizens for responsibility
        | and ethics in washington

1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005

Melanie Ann Pustay
Director, Office of Information and Privacy
U.S. Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C. 20530-0001

# The purge, the spin and KR@georgewbush.com

On the same day that the chairman of the House Judiciary Committee threatened the White House with "compulsory process" if it doesn't start cooperating with a congressional investigation into the firing of U.S. attorneys last year, the Justice Department has turned over a new set of purge-related documents.

We don't know which came first -- the threatening letter or the document dump -- but we do know that this latest round of documents reveals, with more clarity than before, just how hard the White House and the Department of Justice worked to spin away the problems caused by the firings of federal prosecutors:

**Famous last words.** On Dec. 18, 2006, the Justice Department's Rebecca Seidel sent an e-mail to several of her colleagues warning them that Republican Sen. Jon Kyl was "significantly disturbed" over the firing of U.S. attorney Paul Charlton and might raise the matter at an upcoming hearing. "We should ensure that the AG is adequately prepared to deal with a question over the firings of the USAs," she wrote. "Do we need a paper on it, or is the AG prepared?" Associate Deputy Attorney General William Moschella brushed her off: "I don't think he will raise this in public," he said of Kyl. As a short-term matter, Moschella was right: Rather than raising any questions about Charlton during Alberto Gonzales' Jan. 18 appearance before the Senate Judiciary Committee, Kyl praised the attorney general for his work on terrorism and Internet gambling.

**A Joe Conason column.** On Feb. 9, Salon published a column in which Conason argued that the firing of eight U.S. attorneys last year -- we now know it was nine -- represented "a violation of American law enforcement traditions and ... a triumph of patronage over competence." Shortly thereafter, Mark McKinnon, the former chief media advisor for the Bush-Cheney campaign, sent an e-mail message to Peter Wehner, who runs the White House Office of Strategic Initiatives, a Karl Rove invention that the Washington Post has said amounts to "the closest thing the White House has to an in-house think tank."

Why was a private media consultant, who now works for John McCain, communicating with a Rove deputy about Conason's column about firings at the Justice Department? That's not clear from the e-mail chain. What is clear: McKinnon forwarded the column to Wehner, told him that he didn't think Conason was "generally worth responding to" -- don't be hurt, Joe; they feel the same way about the U.S. Senate -- but wondered if there was something "off the shelf" he could use in response to the column. Wehner forwarded the request to Christopher Oprison at the White House Counsel's Office, with copies going to now-departed Gonzales aides Monica Goodling and Kyle Sampson. Goodling responded, providing Oprison with a set of documents she identified as "the relevant talkers and statistics" but noting, "We do not have a canned editorial response." When Oprison asked Goodling if it was OK to pass along the information to McKinnon, she said yes because it had already been given to "friendlies on the Hill."

**The curious quotation marks.** On Feb. 26, Oprison sent a message to Goodling in which he said he needed "to chat about the 'performance evaluations' for the departing U.S. attorneys." He asked her to call him -- some things are better handled outside the White House e-mail system, apparently -- and said that it's a "time sensitive issue for Tony." Tony? Tony? The first Tony that comes to our mind is White House press secretary Tony Snow, who might indeed have been expecting, at that point, to be facing questions about the purge.

**An e-mail to Karl Rove?** On Feb. 28, Special assistant to the president Scott Jennings sent an "urgent" and "high importance" e-mail to a small group that included Gonzales chief of staff Sampson, White House counsel Fred Fielding, deputy White House press secretary Dana Perino and somebody with the address "KR@georgewbush.com." The news: Sen. Pete Domenici's chief of staff had just called to warn the White House that fired New Mexico U.S. attorney David Iglesias would be holding a press conference that day in which he'd say that two members of Congress had pressured him to bring indictments in a politically charged corruption case -- and that he believed his refusal to do so may have had something to do with his firing.

Jennings told Fielding, Perino and "KR" that he would be available to discuss the matter further because, in his words, "once this happens in Albuquerque, the reporters will be asking DOJ and the White House." Jennings told the group that according to Domenici's chief of staff, "Domenici's idea is not to respond" to Iglesias' allegations "and hopefully make this a one-day story." And indeed, when he was first asked about Iglesias' allegations, Domenici said: "I have no idea what he's talking about." Only later did he admit that he was one of the two members of Congress who had called Iglesias about the case -- and that he regretted doing so.

**Missing the talking points.** When Justice Department spokesman Brian Roehrkasse received a copy of Jennings' e-mail, he responded with the operative, if impolitic, question: "My question is why would members of Congress and a U.S. attorney be discussing the timing of a criminal indictment?"

**Heck of a Job, Brian.** On March 3, Roehrkasse forwarded to his Justice Department colleagues a copy of a Washington Post story on the purge that he said was "far better than most recent Post stories on this subject." The piece minimized White House involvement in the purge; quoting sources, it said that the White House had approved the list of prosecutors to be fired only after "senior Justice Department officials identified the prosecutors they believed were not doing enough to carry out President Bush's policies on immigration, firearms and other issues." For the folks working the issue at the Department of Justice, that amounted to a victory. Deputy Attorney General Richard Hertling declared the Post's piece "by far and away the best story I've seen on the subject" and expressed relief that an accompanying Post editorial -- "The Justice Department's firing of a group of U.S. attorneys is neither as sinister as critics suggest nor as benign as the department would have you believe" -- was "not a bad beating, though against our interests."

"Great work, Brian," Sampson said in an e-mail to the group. "Kudos to you and the [deputy attorney general]."

-- Tim Grieve

Print Email Digg it Del.icio.us

Permalink [02:32 EST, May 22, 2007]

Read comments (9)

**Public Relations Expert's Role in Attorney Firing Probed**
By Matt Renner
t r u t h o u t | Report

Tuesday 12 June 2007

    Following a report by Truthout, a Washington, DC watchdog group recently issued a Freedom of Information Act (FOIA) request for records of contacts between the Department of Justice (DOJ) and a high-ranking Republican campaign strategist and public relations consultant.

    Recent documents released to Congressional investigators revealed that public relations expert Mark McKinnon engaged in high-level consultation with the White House after the US attorney firing situation began to boil over. McKinnon, a well-known campaign strategist for the GOP, corresponded in his official capacity as vice chairman of Public Strategies Inc., a corporate public relations firm, with Peter Wehner, director of the White House Office of Strategic Initiatives. The Office of Strategic Initiatives is an executive branch think-tank which "plans, develops and coordinates a long-range strategy for achieving presidential priorities," and "conducts research and assists in message development," according to the White House web site.

    In his email, McKinnon asked Wehner for help in response to a critical article written by Salon.com columnist Joe Conason on Friday, February 9. The following Monday, McKinnon wrote to Wehner asking, "Do we have something off-the-shelf on this?"

    Wehner forwarded McKinnon's inquiry to White House Associate Counsel Christopher Oprison, one of the main lawyers involved in the White House message coordination with the DOJ regarding the attorney firing scandal. In Wehner's email, he includes a caveat that seems to signal that he understood the potentially unethical consequences of bringing an outside public relations expert into the mix: "Would you, [or] somebody at DOJ, be able to send along to me a response to the charges by Joe Conason, which I could pass along to Mark McKinnon? I'd be grateful if you could - and I'd understand if you can't."

    Based on reporting by Truthout, the watchdog group Citizens for Responsibility and Ethics in Washington (CREW) filed an FOIA request to the DOJ. The request states that CREW "seeks all emails sent to or from Mark McKinnon [and/or any individuals associated with its companies] and any former or current DOJ employee in the Offices of the attorney general, deputy attorney general and/or associate attorney general, concerning any aspect of the Congressional inquiry into the firing of US attorneys." The FOIA can be accessed at the CREW web site.

    Despite documented communication with McKinnon, FOIA requests cannot be issued to the White House because the Freedom of Information Act applies only to federal government agencies. No response from White House officials to McKinnon was included in the documents released by the DOJ, but McKinnon confirmed to Truthout that he received "talking points they were using on the Hill and public testimony" from the White House. McKinnon claims that he has not had any contact with the DOJ.

    The Bush administration has a history of paying public relations consultants to help with political messaging. In 2005, during the Bush administration's attempt to privatize Social Security, it was revealed that the administration paid public relations giant Fleishman-Hillard nearly $1.8 million to help trump-up the risks faced by the Social Security system. The Bush administration also came under fire for hiring the public relations firm Ketchum to coordinate messaging for the No Child Left Behind Act (NCLB). As part of a contract agreement between the Department of Education and Ketchum, the popular African-American pundit Armstrong Williams "would regularly comment on NCLB during the course of his broadcasts, and would work with African-American newspapers to place stories and commentary on NCLB." Williams was paid $240,000 for his advocacy of the program. Jill Bratina, a former employee of Ketchum, was later hired by McKinnon's public relations firm.

    In response to a previous Truthout report, McKinnon claimed that he was "not a consultant to the White House," and had "never been paid a dime by the White House or the Republican National Committee." According to McKinnon, he sent an email to the director of the top White House strategy office asking for a "response to Joe Conason's article because he was 'curious about what the facts were,'" and that the White House staff didn't do "anything for me that [they] wouldn't have done for any other citizen."

    McKinnon's campaign strategy company, Maverick Media Inc., was a primary benefactor of the 2000 and 2004 Bush campaigns; Bush spent $170 million with McKinnon's firm during the 2004 election cycle. Previously, McKinnon worked as a media consultant for Democrat Ann Richards in her 1990 and 1994 Texas gubernatorial campaigns. Richards was defeated in 1994 by Bush. After the defeat, McKinnon switched sides and went on to help Bush to reelection in 1998. Bush has called McKinnon "a trusted ally," and said he was "particularly impressed by [McKinnon's] honesty," according to the Public Strategies Inc.'s web site. A scandal involving McKinnon erupted in the run-up to the 2000 presidential election. In preparation for a debate between then Vice President Al Gore and then Governor Bush, McKinnon videotaped a Bush practice debate session. This tape, along with 120 pages of debate preparation documents, were then sent to Gore campaign adviser Tom Downey. The Gore campaign immediately alerted the FBI, who began an investigation. A Maverick

Media employee under McKinnon, Juanita Yvette Lozano (also a former Richards campaign staff member), eventually pleaded guilty to lying to a grand jury during the investigation. A surveillance tape from the post office from which the package was sent clearly depicted Lozano with a package in tow. She falsely claimed that the package she was mailing that day was a pair of khaki pants from the GAP that she was returning on McKinnon's behalf. Lozano was sentenced to one year in prison followed by three years probation for her attempt to cover up her involvement in the leak. McKinnon was not accused of any crime.

While some critics attempted to pin the motivation behind the leak on the Gore campaign, others asserted that this was a dirty trick on behalf of the Bush campaign staff to try and entrap the Gore campaign. After the investigation, the FBI concluded that Gore's campaign staff had acted appropriately.

The emails released by the DOJ show that McKinnon's request for information on the attorney firings was addressed by the DOJ Liaison to the White House Monica Goodling. Goodling sent the White House counsel's office a list of talking points intended to counter claims that the spate of attorney firings were politically motivated. Goodling did not indicate that the information had yet been made public; instead she wrote: "It is info we have given to friendlies on the Hill. It can all go [to McKinnon]." The email chain can be read at the House of Representatives Judiciary Committee's web site.

Goodling's credibility was severely damaged when she testified under immunity before the House Judiciary Committee on May 23. Goodling admitted that she "may have taken inappropriate political considerations into account" when selecting non-political career positions in the DOJ. As of this writing, CREW has not received a response to their FOIA request from the DOJ. The White House has not returned repeated requests for comment on this situation.

FOCUS - 9 of 18 DOCUMENTS

The Associated Press

May 22, 2007 Tuesday 1:11 AM GMT

# Bush defends Gonzales, calls plans for no-confidence vote 'political theater'

**BYLINE:** By BEN FELLER, Associated Press Writer

**SECTION:** WASHINGTON DATELINE

**LENGTH:** 827 words

**DATELINE:** CRAWFORD Texas

President Bush insisted Monday that embattled Attorney General Alberto Gonzales still has his support and denounced Democratic plans for a no-confidence vote as "pure political theater."

"He has done nothing wrong," Bush said in an impassioned defense of his longtime friend and adviser during a news conference at his Texas ranch.

Despite Bush's comments, support for Gonzales is eroding, even in the president's own party. The Senate is prepared to hold a no-confidence vote, possibly by week's end, and five Republican senators have joined many Democrats in calling for Gonzales' resignation.

The attorney general is under investigation by Congress for last year's ousters of eight federal prosecutors.

He is also under fire for an alleged 2004 hospital visit, as White House counsel, to have the then-ailing Attorney General John Ashcroft certify the legality of Bush's controversial warrantless eavesdropping program. The visit was detailed last week by former Deputy Attorney General Jim Comey.

In Washington, the Justice Department released a new batch of documents linked to the firings in anticipation of House testimony Wednesday by Monica Goodling, Gonzales' former counsel and White House liaison.

The Justice Department has maintained the firings planned in part by Goodling targeted underperforming U.S. attorneys. But Democrats believe they were politically motivated, and pointed Monday to e-mails between Goodling and White House political staffers about how to respond to the firestorm the dismissals created.

At one point, in mid-February, Goodling offered talking points and testimony by Deputy Attorney General Paul McNulty as part of a White House effort to respond to a story in the online magazine Salon.

"Monica, other than the McNulty testimony, is any of this material public and can it be disseminated to Mark McKinnon?" White House aide Chris Oprison asked Goodling in a Feb. 15 e-mail. McKinnon was Bush's political media consultant and

now works for the presidential campaign of John McCain.

"It is info we have given to friendlies on the Hill," Goodling responded. "It can all go."

The president told the Democrats to get back to more pressing matters. He did not directly answer a question about whether he intended to keep Gonzales in office through the end of his presidency regardless of what the Senate does.

"I stand by Al Gonzales, and I would hope that people would be more sober in how they address these important issues," Bush said. "And they ought to get the job done of passing legislation, as opposed to figuring out how to be actors on the political theater stage."

Gonzales does not necessarily need Congress' support to continue serving. But Bush and Gonzales are under increasing pressure as more lawmakers demand the attorney general's departure.

Democrats pressed ahead with plans to put the Senate on record in expressing a lack of confidence in him.

"The president should understand that while he has confidence in Attorney General Gonzales, very few others do," said Sen. Chuck Schumer, D-N.Y., in response to Bush's comments.

Gonzales leaves Tuesday for Europe, where he will attend the G-8 summit in Munich.

The new documents highlight the Justice Department's attempts to manage the firings controversy.

An undated document marked "PRIVACY ACT PROTECTED" offers responses to potential questions about why each fired prosecutor was dismissed. Its unidentified author suggests that former U.S. attorney Margaret Chiara in Grand Rapids, Mich., be rewarded for her public silence with minimal public criticism. However, the letter advised to describe Chiara as having "lost the confidence" of her staff if a more explicit answer was demanded.

A chart compiled by Goodling, dated Feb. 12, panned the leadership abilities of the eight fired prosecutors and compared them with years of mostly complimentary peer reviews each received.

For example, Seattle prosecutor John McKay showed a "pattern of insubordination, poor judgment, and demonstration of temperament issues," according to his leadership evaluation, which was compiled by Justice officials. His peer review, by contrast, called McKay "an effective, well-regarded, and capable leader."

Justice officials also highlighted New Mexico prosecutor David Iglesias, appearing to question why he was included among those fired.

"I didn't remember Iglesias being on list, but I could be mistaken," wrote Deputy Assistant Attorney General Rebecca Seidel to fellow Justice legislative aide Nancy Scott-Finan in a Dec. 19 e-mail about the resigning prosecutor's letter to his staff.

A month later, John Nowacki, a deputy in the Justice office that oversees U.S. attorneys, alerted fellow staffer David T. Best to "if you still have them, please hold the resignation letters from USA Iglesias to the President and the AG."

"If they've already gone, please let me know," Nowacki wrote.

Associated Press writers Laurie Kellman and Lara Jakes Jordan contributed to this report from Washington.

**LOAD-DATE:** May 22, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newswire

Copyright 2007 Associated Press
All Rights Reserved

FOCUS - 6 of 18 DOCUMENTS

Salon.com

May 22, 2007 Tuesday

# The purge, the spin and KR@georgewbush.com

**BYLINE:** Tim Grieve

**SECTION:** WAR ROOM

**LENGTH:** 1073 words

**HIGHLIGHT:** Newly released documents show damage-control efforts at the White House and the Justice Department.

On the same day that the chairman of the House Judiciary Committee threatened the White House with "compulsory process" if it doesn't start cooperating with a congressional investigation into the firing of U.S. attorneys last year, the Justice Department has turned over a new set of purge-related documents.

We don't know which came first -- the threatening letter or the document dump -- but we do know that this latest round of documents reveals, with more clarity than before, just how hard the White House and the Department of Justice worked to spin away the problems caused by the firings of federal prosecutors:

Famous last words. On Dec. 18, 2006, the Justice Department's Rebecca Seidel sent an e-mail to several of her colleagues warning them that Republican Sen. Jon Kyl was "significantly disturbed" over the firing of U.S. **Attorney** Paul Charlton and might raise the matter at an upcoming hearing. "We should ensure that the AG is adequately prepared to deal with a question over the firings of the USAs," she wrote. "Do we need a paper on it, or is the AG prepared?" Associate Deputy Attorney General William Moschella brushed her off: "I don't think he will raise this in public," he said of Kyl. As a short-term matter, Moschella was right: Rather than raising any questions about Charlton during Alberto Gonzales' Jan. 18 appearance before the Senate Judiciary Committee, Kyl praised the attorney general for his work on terrorism and internet gambling.

A Joe Conason column. On Feb. 9, Salon published a column in which Conason argued that the firing of eight U.S. **attorneys** last year -- we now know it was nine -- represented "a violation of American law enforcement traditions and . . . a triumph of patronage over competence." Shortly thereafter, Mark McKinnon, the former chief media advisor for the Bush-Cheney campaign, sent an email message to Peter Wehner, who runs the White House Office of Strategic Initiatives, a Karl Rove invention that the Washington Post has said amounts to "the closest thing the White House has to an in-house think tank."

Why was a private media consultant, who now works for John McCain, communicating with a Rove deputy about Conason's column about firings at the Justice Department? That's not clear from the e-mail chain. What is clear: McKinnon forwarded the column to Wehner, told him that he didn't think Conason was "generally worth responding to" -- don't be hurt, Joe; they feel the same way about the U.S. Senate

-- but wondered if there was something "off the shelf" he could use in response to the column. Wehner forwarded the request to Christopher Oprison at the White House Counsel's Office, with copies going to now-departed Gonzales aides Monica Goodling and Kyle Sampson. Goodling responded, providing Oprison with a set of documents she identified as "the relevant talkers and statistics" but noting, "We do not have a canned editorial response." When Oprison asked Goodling if it was OK to pass along the information to McKinnon, she said yes because it had already been given to "friendlies on the Hill."

The curious quotation marks. On Feb. 26, Oprison sent a message to Goodling in which he said he needed "to chat about the 'performance evaluations' for the departing U.S. attorneys." He asked her to call him -- some things are better handled outside the White House e-mail system, apparently -- and said that it's a "time sensitive issue for Tony." Tony? Tony? The first Tony that comes to our mind is White House Press Secretary Tony Snow, who might indeed have been expecting, at that point, to be facing questions about the purge.

An e-mail to Karl Rove? On Feb. 28, Special Assistant to the President Scott Jennings sent an "urgent" and "high importance" e-mail to a small group that included Gonzales Chief of Staff Kyle Sampson, White House Counsel Fred Fielding, Deputy White House Press Secretary Dana Perino and somebody with the address "KR@georgewbush.com" The news: Sen. Pete Domenici's chief of staff had just called to warn the White House that fired New Mexico U.S. Attorney David Iglesias would be holding a press conference that day in which he'd say that two members of Congress had pressured him to bring indictments in a politically charged corruption case -- and that he believed his refusal to do so may have had something to do with his firing.

Jennings told Fielding, Perino and KR that he would be available to discuss the matter further because, in his words, "once this happens in Albuquerque, the reporters will be asking DOJ and the White House." Jennings told the group that, according to Domenici's chief of staff, "Domenici's idea is not to respond" to Iglesias' allegations "and hopefully make this a one-day story." And indeed, when he was first asked about Iglesias' allegations, Domenici said: "I have no idea what he's talking about." Only later did he admit that he was one of the two members of Congress who had called Iglesias about the case -- and that he regretted doing so.

Missing the talking points. When Justice Department spokesman Brian Roehrkasse received a copy of Jennings' e-mail, he responded with the operative, if impolitic, question: "My question is why would members of Congress and a U.S. attorney be discussing the timing of a criminal indictment?"

Heck of a Job, Brian. On March 3, Roehrkasse forwarded to his Justice Department colleagues a copy of a Washington Post story on the purge that he said was "far better than most recent Post stories on this subject." The piece minimized White House involvement in the purge; quoting sources, it said that the White House had approved the list of prosecutors to be fired only after "senior Justice Department officials identified the prosecutors they believed were not doing enough to carry out President Bush's policies on immigration, firearms and other issues." For the folks working the issue at the Department of Justice, that amounted to a victory. Deputy Attorney General Richard Hertling declared the Post's piece "by far and away the best story I've seen on the subject" and expressed relief that an accompanying Post editorial -- "The Justice Department's firing of a group of U.S. attorneys is neither as sinister as critics suggest nor as benign as the department would have you believe" -- was "not a bad beating, though against our interests."

"Great work, Brian," Sampson said in an e-mail to group. "Kudos to you and the [deputy attorney general]."

**LOAD-DATE:** May 22, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Web Publication

Copyright 2007 Salon.com, Inc.
All Rights Reserved

4 of 848 DOCUMENTS

Salon.com

May 22, 2007 Tuesday

# The Justice Department vs. Joe Conason

**BYLINE:** Joan Walsh

**SECTION:** JOAN WALSH - MISC

**LENGTH:** 517 words

**HIGHLIGHT:** How Mark McKinnon helped the White House fight the Salon columnist's charges against Alberto Gonzales.

Some of the Justice Department documents dumped last night depict frantic efforts by administration underlings to wildly spin the firing of eight U.S. attorneys after aggressive reporters began poking holes in the explanation that they were let go for "performance" reasons. I particularly enjoyed a sequence in which the infamous Bush strategist Mark McKinnon asks for help combating Joe Conason's Feb. 9 Salon column about the attorney purge, "Alberto Gonzales' Coup d'état."

When the ultimate Bush history is written, McKinnon himself will be an interesting footnote. A political strategist for Texas Gov. Ann Richards before he hooked up with Bush, McKinnon was crucial to the myth-making that Bush was a different kind of Republican, congenial to Democrats like McKinnon, determined to fight for the poor and minorities -- a compassionate conservative. McKinnon now runs his own consulting business, Public Strategies, but in the e-mail dump last night, he's found writing to Pete Wehner in the Office of Strategic Initiatives -- yes, a White House think tank created by Karl Rove -- about the Conason column. "Pete, I don't think Conason is generally worth responding to, but do we have something off the shelf on this? Thanks, mck." Wehner scrambles, asking Chris Oprison in the White House counsel's office whether someone there would be able to send him "a response to the charges by Joe Conason, which I could pass along to Mark McKinnon?" The ever-obliging Monica Goodling comes up with a 13-page document, complete with "Fact Sheets," "Talking Points" and "Examples of Difficult Transitions." She assures Obrison he can share the document with McKinnon, because "it is all information we have given to friendlies on the Hill." Goodling, remember, categorizes people as "loyal Bushies" and now "friendlies," a sophisticated taxonomy that's no doubt just another benefit of her rigorous education at Regent University.

I asked Conason what he thought about the spin job, and he shared with me an e-mail exchange he had with McKinnon. Once upon a time, back in 1999, McKinnon spun Conason on the wisdom and mercy of Texas Gov. George W. Bush, and Conason elaborated on that memory in his e-mail to McKinnon.

Dear Mark,

I see in the latest DOJ document dump that you asked the White House for a

response to my column of last February 9. Believe me when I say how flattered I feel, even though you think I'm not "generally worth responding to." I guess we'll find out more when Monica testifies, eh? Your Monica, I mean.

I haven't thought about you for a while. But seeing that little memo brought back fond memories of our breakfast in Austin back in 1999 with Stu Stevens, eating those tasty tortillas and listening to you wax on about all the great things Dubya was going to do for the poor folks, and how that made you well up a bit.

I sure hope he's lived up to your expectations. The rest of us are somewhat disappointed. Very best regards,

Joe

Within an hour, McKinnon replied:

Touche Joe.

Maybe someday in the future, we can break tortillas in New York City somewhere and reflect about all this.

McK

**LOAD-DATE:** May 23, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Web Publication

Copyright 2007 Salon.com, Inc.
All Rights Reserved

FOCUS - 16 of 18 DOCUMENTS

Cox News Service

March 13, 2007 Tuesday

# GONZALES REFUSES TO RESIGN AS CONGRESS DEMANDS ANSWERS

**BYLINE:** REBECCA CARR and KEN HERMAN

**SECTION:** Washington General News

**LENGTH:** 2074 words

WASHINGTON - Attorney General Alberto Gonzales rebuffed calls for his resignation Tuesday as lawmakers demanded answers about the White House's role in the firing of U.S. **attorneys** across the country.

"I believe in accountability," said Gonzales, speaking at a hastily arranged news conference to fend off attacks from Congress. "I acknowledge that mistakes were made here.? I accept that responsibility and my pledge to the American people is to find out what went wrong here, to assess accountability, and to make improvements so that the mistakes in this instance do not occur again in the future."

Gonzales' mea culpa was the latest in a series of recent events that have forced the administration into damage-control mode.

Last week, Gonzales and FBI Director Robert Mueller acknowledged that his agency improperly used surveillance techniques.

Also last week, the administration dealt with the fallout from the federal conviction of I. Lewis "Scooter" Libby, former chief of staff for Vice President Cheney for lying to FBI agents investigating the disclosure of a CIA operative.

The verdict came as the administration scrambled in the wake of reports of squalid conditions at an outpatient facility at Walter Reed Army Medical Center.

In many of the situations, the White House has adopted the lessons-learned mode it first employed after its botched response to Hurricane Katrina where officials accept blame and take action.

"I've overcome a lot of obstacles in my life to become attorney general,"

Gonzales said. "I am here not because I give up.? I am here because I've learned from my mistakes, because I accept responsibility, and because I am committed to doing my job.? And that is what I intend to do here on behalf of the American people."

But apologies did little to stave off both Republicans and Democrats in Congress.

Sen. Charles E. Schumer called for Gonzales' ouster as Sen. Patrick Leahy, chairman of the Senate Judiciary Committee, called for open hearings featuring

White House and Justice Department officials. Key Republicans agreed that hearings are in order.

Sen. John Cornyn, R-Texas, a long-time friend of Gonzales from their days in Texas, said that the dismissal of

U.S. attorneys has not been handled well by the

Justice Department. He said he supports Judiciary Committee's inquiry, noting that in Texas there is always "a trial before a hanging."

"We ought to follow the facts wherever they lead," Cornyn said. "This should not be a partisan issue. It should be one of oversight and I support Senator Leahy to get to facts."

Leahy said he was "angered" to discover in the Washington Post and New York Times early Tuesday morning that internal e-mails and documents show that there was collusion between the White House and the Justice Department to dismiss U.S. attorneys around the country. He vowed to have hearings as soon as possible because the testimony so far "has not been complete."

Deputy Attorney General Paul McNulty and other Justice Department officials have told Congress under oath that the decision to fire the eight U.S. attorneys was made by the Justice Department without intervention by the White House.

The documents released Tuesday show that Harriet Miers, the White House legal counsel suggested two years ago that the Justice Department fire all 93 U.S. attorneys across the country.

"Obviously, I am concerned about the fact that information-incomplete information was communicated or may have been communicated to the Congress," Gonzales said.

Gonzales said that he did not agree with that proposal from Miers. He approved the dismissal of a smaller group of prosecutors. He assigned D. Kyle Sampson, his chief of staff, to handle the matter.

Sampson resigned on Monday, reportedly after he admitted that he did not tell his bosses about the extent of his many discussions with the White House about removing the prosecutors. That led to incomplete testimony before Congress-a fact that lawmakers seized upon.

"Time and time again, we've heard falsehoods," said Schumer in a floor speech immediately after Gonzales held his press conference.

"We were told by the attorney general that he would "never ever make a change for political reasons,'" Schumer said. "It now turns out all this was false, as the evidence makes clear that this purge was based purely on politics - to punish prosecutors who were perceived to be too light on Democrats or too tough on Republicans."

The batches of e-mails and internal documents indicated that the Justice Department had not fully explained the White House's role in the dismissal of seven top prosecutors in December and another a few months earlier.

In a Sept 13, 2006, e-mail to Miers, Sampson listed one dismissed prosecutor, Bud Cummins in Arkansas, ``in the process of being pushed out.'' Five other prosecutors -- in Arizona, Nevada, Grand Rapids, Mich., San Diego and Seattle -- were listed as U.S. attorneys ``we should now consider pushing out.''

Four days later, Miers responded: ``Kyle, thanks for this. I have not forgotten I need to follow up on the info but things have been crazy.''

But nearly three months later, Sampson wrote to another aide that they were still waiting for White House approval.

``Still waiting for green light from White House,'' Sampson wrote in a Dec. 2, 2006, e-mail to Michael Elston, McNulty's top aide.

Two days later, the White House deputy counsel sent Sampson an e-mail indicating that they were "a go for the US Atty plan."

Both the House and Senate Judiciary committees are investigating whether the attorneys were dismissed for political reasons. At the time of their ouster, five of the eight were involved with political corruption investigations of Republicans.

Bush, in Mexico on the penultimate day of his trip to Latin America, had no comments Tuesday on the developments. But spokesman Tony Snow sought to downplay the firings and said Bush remains supportive of Gonzales, his long-time friend and aide.

The episode began, according to Snow, with Miers' reference to bringing in "fresh blood" after the 2004 re-election. But he said her suggestion to ask all 93 U.S. attorneys to resign "was quickly rejected by the Justice Department."

"Nobody at the White House was involved in suggesting the firing of 93 attorneys," Snow said. "It was not a firm recommendation that you're firing everybody."

Bush, Gonzales and other Justice Department officials discussed the matter in a White House meeting last October, Snow said. The contact was appropriate because it dealt with administration concerns over whether reports of voter fraud were being pursued with sufficient vigor, he said.

"If somebody had passed on a concern about vote fraud allegations and we had not passed it on, can you imagine the kind of second-guessing we would have?" Snow said, adding, ``You're not making recommendations, you're not issuing pressure, you're not saying `Fire somebody!'"

No specific U.S. attorneys were discussed during the session, according to Snow, who said Bush was unaware of Miers' proposal to fire all of them.

"We don't have anything to indicate the president made any calls on specific U.S. attorneys," Snow said.

The documents prompted an outcry from ethics advocates and presidential candidates alike.

Democratic contender John Edwards called for Gonzales to resign. Citizens for Responsibility and Ethics in Washington sent a letter to Gonzales asking for the immediate appointment of a special prosecutor to investigate potential criminal violations related to the recent dismissals of the eight U.S. attorneys.?

And House Speaker Nancy Pelosi, D-Calif., said the House would vote next week on a bill that would repeal a Patriot Act provision giving the attorney general the right to appoint U.S. attorneys for an indefinite amount of time.

"Essential to our democracy is an independent judicial system," Pelosi said.

"Our U.S. attorneys are on the front lines in the fight against terrorism and public corruption, and violent crime."?

Federal law provides that if Sampson knew that he was causing DOJ officials to make inaccurate statements to Congress, then he can be prosecuted for the federal crime of lying to Congress even though he did not personally make any statements to Congress, said Melanie Sloan, executive director of the nonpartisan ethics group.

? A special prosecutor should investigate not only Mr. Sampson's conduct but whether anyone else was involved in formulating the incomplete and erroneous congressional testimony or whether the officials who testified were aware that they were providing imperfect information to Congress, Sloan said.

But some Bush loyalists, while acknowledging the challenging series of events, insisted the administration is not on its last legs.

"They may be down, but they're not out," said Mark McKinnon, Bush's campaign media adviser who is now working in Sen. John McCain's presidential campaign. "And until they're out, I think they'll continue to demonstrate resolve to make progress and get things done. There are many chapters still left to write before this book is over."

At the Washington-based New America Foundation, Michael Lind, author of "Made in Texas: George W. Bush and the Southern Takeover of American Politics," cautioned against overestimating the damage done to the White House.

Lind is a Bush critic who has said the president's handling of Iraq will relegate him to a list of the five worst U.S. presidents.

"I think that they have more power than you might think because their essential strategy was shaped by people like Cheney and (former Defense Secretary Donald) Rumsfeld and others who were veterans of the Nixon administration," Lind said.

As such, he said, they worked to restore presidential power they believe was unfairly weakened in the post-Watergate era.

"It would be a mistake to underestimate the autonomy of the American president, particularly one who does not have to be re-elected," Lind said. "He is very confident, if not stubborn."

"So when they are caught they may try to get the thing off the news cycle as quickly as possible," Lind said. "But that does not mean they are not doing five other things we don't know about that just haven't been exposed yet."

Kathleen Hall Jamieson, dean of the Annenberg Public Policy Center at the University of Pennsylvania, said the administration's woes have put Bush at a precariously low point.

"The public starts out assuming an administration is competent," she said. "At a certain point, the presumption is that it may not be. And you reach a certain point in which the problems an administration is having begin to aggregate and the public begins to ask whether everything is political."

"I think we are at that point now with the current administration," she said, noting that Bush's popularity was low - largely as a result of Iraq - before the most recent problems.

The problems, she said, are complicated by the congressional investigation and subpoena power that voters handed to Democrats last November.

"You are already seeing a lot of hearings," Jamieson said. "You are going to see a lot of subpoenas."

She recalled that President Nixon, at the height of Watergate, retained the support of a quarter of the populace.

"I always assumed that was the floor. President Bush is not very much above that now," Jamieson said.

(Story can end here; optional add follows)

Bruce Buchanan, a University of Texas government professor and longtime observer of Texas politics, said that Cornyn's support of Leahy was "out of character."

But Buchanan said he could not tell whether Cornyn's remarks were prompted by belief that an investigation would exonerate the White House or because he "perceives the matter has gotten so far out of hand that now is the time for him to jump ship."

"That ship has taken on enough water that some Republicans have started to jump off on various issues," Buchanan said. "He could be joining that crowd, which is unusual because of his diehard support until now."

Buchanan, noting that U.S. **attorneys** are political appointees and that President Clinton dismissed all 93 of them when he took office, said the firings are not the problem.

"This is much ado about nothing except for the ham-handed handling of it. Clinton fired 93 of them. That in itself is not a problem. The problem is they are handling it like they feel guilty," Buchanan said.

Rebecca Carr's e-mail is rcarr@coxnews.com

Ken Herman's e-mail is kherman@coxnews.com

On the Web:

Justice Department:

http://www.usdoj.gov/

**LOAD-DATE:** March 14, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newswire

Copyright 2007 Cox Enterprises, Inc.

# EXHIBIT L

**U.S. Department of Justice**

Office of Information and Privacy

RECEIVED AUG 0 8 2007

Telephone: (202) 514-3642                     Washington, D.C. 20530

AUG 0 6 2007

Anne Weismann, Esq.
Chief Counsel
Citizens for Responsibility and Ethics
  in Washington                                  Re:    AG/07-R0617
1400 Eye Street, NW                                   DAG/07-R0618
Suite 450                                             ASG/07-R0619
Washington, DC 20005                                  CLM:MLF:GEB

Dear Ms. Weismann:

    This is an interim response to your Freedom of Information Act (FOIA) request dated May 23, 2007, which was received in this Office on May 25, 2007, in which you requested copies of emails between former and current Department of Justice employees in the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General and Mark McKinnon or Maverick Media, Inc., or Public Strategies, Inc. regarding the Congressional inquiry into the firings of United States Attorneys. This response is made on behalf of the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General.

    Please be advised that record searches were conducted in the Offices of the Attorney General and Associate Attorney General. No records responsive to your request were located. We are continuing our search in the Office of the Deputy Attorney General and will write to you again once this search is completed.

    If you are not satisfied with my action on this interim response, you may administratively appeal by writing to the Director, Office of Information and Privacy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, within sixty days from the date of this letter. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

                    Sincerely,

                    *Marilyn L. Falksen*

                    Carmen L. Mallon
                    Chief of Staff

**CIVIL COVER SHEET**

JS-44
(Rev. 2/01 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Citizens for Responsibility and Ethics in Washington | U.S. Department of Justice |

| **(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 11001 <br> (EXCEPT IN U.S. PLAINTIFF CASES) | **COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** 11001 <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE: In land condemnation cases, use the location of the tract of land involved |

| **(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)** | **ATTORNEYS (IF KNOWN)** |
|---|---|
| Kimberly D. Perkins <br> Anne L. Weismann <br> Citizens for Responsibility and Ethics in Washington <br> 1400 Eye Street, N.W., Suite 450 <br> Washington, D.C. 20005 <br> 202-408-5565 | |

**II BASIS OF JURISDICTION**
(SELECT ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** ( FOR DIVERSITY CASES ONLY!)
(SELECT ONE FOR PLAINTIFF AND ONE FOR DEFENDANT)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Select one category, A–N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ G. Habeas Corpus/2255 | ○ H. Employment Discrimination | ◉ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 USC sec. 552. The U.S. Department of Justice has failed to grant plaintiff's request for expedited processing.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Select YES only if demanded in complaint

JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☐ YES    ☒ NO    If yes, please complete related case form.

DATE 9/13/07    SIGNATURE OF ATTORNEY OF RECORD _____

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.